NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2022 IL App (4th) 200299-U

NO. 4-20-0299

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
February 7, 2022
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Champaign County |
| DANGELIS M. CHAMBERS, | ) | No. 18CF1775 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Roger B. Webber, |
| | ) | Judge Presiding. |

JUSTICE HARRIS delivered the judgment of the court.
Justices Turner and Holder White concurred in the judgment.

**ORDER**

¶ 1    *Held*:  (1) The trial court committed no error in partially denying defendant's motion to present evidence of the victim's propensity for violence.

(2) The trial court's improper admission of hearsay statements under the excited utterance exception was harmless error.

(3) Defendant was not denied his right to a fair trial by the prosecutor's comments during closing arguments.

¶ 2    Following a jury trial, defendant, Dangelis M. Chambers, was convicted of first degree murder (720 ILCS 5/9-1(a)(1) (West 2018)) and sentenced to 55 years in prison. He appeals, arguing he was denied a fair trial because (1) the trial court erroneously barred him from presenting certain evidence of the victim's propensity for violence, (2) the court erroneously admitted a witness's hearsay statements under the excited utterance exception to the hearsay rule,

and (3) the prosecutor misstated the law regarding an initial aggressor's duty to retreat during closing arguments. We affirm.

¶ 3                                    I. BACKGROUND

¶ 4        In December 2018, the State charged defendant with four counts of first degree murder (*id.* § (a)(1), (a)(2)) (counts I through IV) and one count of unlawful possession of a weapon by a felon (*id.* § 24-1.1(a)) (count V) in connection with the shooting death of Renese Riley. (The State later added a charge of second degree murder (*id.* § 9-2(a)(2)) (count VI), but that count was dismissed on the State's motion prior to trial.) The charges were based on claims that defendant and Riley were involved in dating relationships with two sisters, Demeisha and Denika Carlton. In the early morning hours of December 30, 2018, defendant and Riley engaged in a physical altercation outside the sisters' apartment building during which defendant shot and killed Riley, who was unarmed. Defendant acknowledged shooting Riley but maintained Riley was the aggressor during a confrontation between the two and he shot Riley in self-defense.

¶ 5                              A. Pretrial Proceedings

¶ 6        Prior to trial, the parties filed various pretrial motions. Relevant to this appeal, in August 2019, defendant filed a motion to introduce evidence at trial of Riley's propensity for violence. He maintained Riley's aggressive and violent character was relevant to his theory of self-defense and asked that he be permitted to present evidence that (1) in December 2011, Riley struck a woman named Julia Burrage in the face with a comb, resulting in a domestic battery charge; (2) in December 2018, defendant and Demeisha witnessed Riley arguing with Denika and heard him threaten to have Denika "jump[ed]" and her apartment "shot up"; (3) in December 2018, Demeisha encountered three of Riley's female relatives who reported that they had been sent by Riley "to confront and fight" defendant; (4) in 2018, defendant and Demeisha witnessed Riley

argue with Denika and shove her into a wall; (5) in 2018, Riley was involved in an altercation with Demeisha and Denika's mother, Sherri Carlton, during which he "pulled [Sherri's] hair and grabbed her by the neck[,] causing scratches to her neck"; (6) Sherri witnessed Riley "beat on and push Denika"; and (7) in November 2018, "Riley posted on Facebook 'I got murda [*sic*] on my mind.' "

¶ 7        During hearings on the motion, defendant presented offers of proof that included recordings of interviews a defense investigator conducted with Demeisha and Sherri. Ultimately, the trial court granted the portions of defendant's motion in which he sought to present evidence that Riley threatened to have Denika attacked and her apartment "shot up" and evidence that he shoved Denika into a wall. The court reserved its ruling on defendant's request to admit evidence of Riley's purported Facebook posting and otherwise denied his motion. Regarding defendant's request for the admission of evidence that Riley pulled Sherri's hair and grabbed her neck, the court specifically stated as follows:

> "[Evidence of an altercation involving Riley and Sherri] I think would be appropriate, depending on exactly what that testimony would be. So I think I need either more specific representations as to who initiated that altercation. From the interview that I heard of Sherri ***, it's very uncertain as to when, where that took place. It's very generic, that he was arguing all the time. I don't recall her mentioning even a month or a year of when that took place. So I'm going to deny the offer as to [that paragraph] unless you want to make an offer of proof and provide some additional foundational specificity."

The record does not reflect that defendant made any further offer of proof.

¶ 8        In November 2019, the State filed a motion *in limine*, asking the trial court to find

recorded statements Denika made after the shooting admissible under the excited utterance or spontaneous declaration exception to the hearsay rule. According to the State, Riley was shot around 2:30 a.m. and transported to the hospital. Denika rode with him in the ambulance and, at approximately 4:30 a.m., made statements to the police while "visibly upset." The State alleged Denika reported that prior to the shooting, she got into an argument with defendant at her apartment and called Riley to help her pack her belongings so she and her child could stay the night in a hotel. Upon Riley's arrival, he remained "outside the apartment building by the gate" and said something that upset Demeisha and defendant. Although Denika tried to hold the gate shut, defendant "was able to push the gate open and started fighting with Riley." Denika asserted Riley punched defendant in the face and defendant shot Riley. Denika believed defendant retrieved the gun from his sleeve or pocket and stated she did not see Riley with a gun.

¶ 9        During a hearing on the motion, defendant presented police reports of the officers who initially responded to the scene of the shooting and who took Denika's statement at the hospital. Those reports show the police were dispatched to a call about a shooting at approximately 2:30 a.m. The responding officers observed Riley lying on the ground and bleeding heavily from his chest. Denika was standing over him and screaming for help. An officer noted he "attempted to speak with Denika but she was screaming and crying hysterically." The reports show Riley was transported to the hospital and later pronounced dead. At the hospital, Officer John Franquemont briefly spoke with Denika. He described her as being "very upset and crying uncontrollably" and stated she reported that following a domestic incident earlier in the evening, Riley "came back to the apartment upset because [Denika's] sister's boyfriend was upset with Denika for an unknown reason." Franquemont noted in his report that he did not get the name of either Denika's sister or her sister's boyfriend. He relayed what Denika told him to two other officers, Jeff Steinberg and

- 4 -

Elizabeth Alfonso, who then spoke with Denika and obtained her recorded statement.

¶ 10        Alfonso's police report described Denika as "very emotional" and, at times, shouting. She noted Denika's friend, Myeshia Hinshaw, was also present at the hospital "for support," along with Denika's 10-month-old daughter. According to Alfonso's report, Denika called Hinshaw to help with Denika's child and Denika "told [Hinshaw] what happened."

¶ 11        After taking the matter under advisement, the trial court granted the State's motion. In setting forth its ruling, the court stated the "shooting of a loved one" was clearly a sufficiently startling event to produce a spontaneous and unreflective statement and held Denika's recorded statements related to that occurrence. The court considered the fact that the statements at issue occurred two hours after the shooting to be "a little bit of a problem," but noted case authority suggested there was "no hard and fast time limit" when determining whether the exception applied. After ruling that Denika's recorded statements were admissible, the court indicated the recording should be "narrow[ed] *** down" to only those relevant portions. Following further hearings in the matter and arguments by the parties, the court ordered portions of the recording redacted before being played at defendant's trial.

¶ 12                    B. Defendant's Jury Trial

¶ 13        At trial, the State presented evidence that Demeisha and Denika resided together in a second-floor apartment of a three-story building located at 2008 Vawter Street in Urbana, Illinois. At the time of the shooting, defendant and Demeisha were dating, and defendant was frequently at the sisters' apartment. Riley was the father of Denika's child and also frequented the apartment.

¶ 14        Around 1:45 a.m. on December 30, 2018, the police responded to a call about a possible domestic disturbance at the sisters' apartment. Urbana police officer Oliver Marquez

responded to the call and spoke with Demeisha. He also observed a woman speaking on a cell phone and could overhear her saying " [']I want to go.['] " After looking around and not observing any injuries or signs of a struggle, Marquez "cleared the call" and left the scene.

¶ 15        Approximately 45 minutes later, at 2:28 a.m., the police received a call about a fight and then a possible shooting outside the Vawter Street apartment building. At the scene, they found Riley, bleeding and lying face down on the ground, with Denika nearby. A .22-caliber miniature revolver was found on the ground underneath Riley's body. Riley was transported to the hospital, where he was pronounced dead at 3:25 a.m. Thereafter, the police collected Riley's clothing and items found in his pockets. No weapons were discovered with the items collected.

¶ 16        The day after the shooting, Dr. Shiping Bao, a forensic pathologist, performed an autopsy on Riley. He noted a contusion and laceration to Riley's right eye consistent with Riley "receiving a punch or other blunt force throw to his eye" prior to his death. Dr. Bao testified Riley's cause of death was a gunshot wound to the chest. A bullet was recovered from Riley's body and further analysis of that item revealed that the .22-caliber miniature revolver, found underneath Riley's body, was the weapon used in the shooting.

¶ 17        The State presented testimony from four eyewitnesses to the underlying events. Denika testified that in the early morning hours of December 30, 2018, she got into an argument with defendant—whom she previously had known as "D"—and Demeisha about Riley and his sister being at the apartment. The police were called and, upon their arrival, spoke with Demeisha. While the police were present, Denika packed her and her child's belongings "[b]ecause [she] was tired of being there." She called Riley to assist her. After the police left, Riley arrived. He remained outside and beyond the building's security gate but was "yelling" at defendant to "come downstairs." According to Denika, Riley could not get through the gate and into the building. She

testified she went downstairs and stood inside the gate, trying to calm Riley down. Eventually, however, defendant also came downstairs and went through the gate. Riley and defendant then fought, and defendant shot Riley.

¶ 18    Denika testified that, after the shooting, she went to the hospital where Riley was receiving emergency medical care. At some point, she was informed that Riley had passed away. Denika described herself as "[s]ad, heartbroken, hurt, [and] disappointed." While at the hospital and approximately two hours after the shooting, Denika spoke with the police. A recording of that interaction was admitted into evidence and played for the jury. On the recording, Denika provided answers in response to questions posed by the police officers. She sounded emotional and, at times, could be heard yelling and crying.

¶ 19    During the interview, Denika reported that defendant—her "sister's boyfriend," who everyone called "D"—shot Riley. She provided a physical description of both defendant and his vehicle. Denika further described arguing with Demeisha and defendant and stated she called Riley to help her pack so that she could leave the apartment. When Riley arrived, "he was hostile" and "yelling." Denika asserted that at one point the gate was open, and she had her arm around Riley's neck, trying to calm him down. Riley would not listen but also never stepped inside the gate. Denika asserted she closed the gate, thinking that as "long as [Riley was] outside he [was] safe." Demeisha and defendant were also inside the gate. According to Denika, Demeisha and defendant "kept trying to get [Denika] to remove [her] hand from off the gate." Denika stated she "was not letting go" in an effort to prevent the men from fighting but Demeisha told her to "let them fight." She indicated the men ended up "fighting *** man to man" and defendant "pull[ed] out a *** weapon on [Riley]." Denika further stated defendant and Riley had "issues" before, noting a time when she and Riley "got into it" and defendant "kind of got in [Riley's] way."

¶ 20    After the recording was played, Denika further testified that the gate to the apartment building would lock when closed. The only way to open the gate was with a key or pushing on the gate from the inside of the building. She stated Riley did not have a key to the gate. Denika reiterated that, at one point, she opened the gate and had her arm around Riley's neck, telling him to calm down. After it became clear to her that Riley would not calm down, Denika "closed the gate back" and Riley had no way to get into the building.

¶ 21    Denika testified she remained standing at the gate and when defendant and Demeisha came downstairs, she was holding the gate closed. She stated Demeisha and defendant "kept trying to push it open ***." Denika testified Riley was standing on the opposite side of the gate "right there where [she] was." He stopped yelling and took his jacket and his hoodie off. Denika testified Riley was challenging defendant to a fight. Defendant attempted to push past Denika three times and was successful the third time. When the gate was open, defendant followed Demeisha to his vehicle and put something in the back. Demeisha remained in the vehicle, but defendant returned to where Riley was and the two began fighting.

¶ 22    Denika testified the men exchanged blows and "they both fell backward at different times." She stated that during the fight defendant struck Riley. She identified a picture of Riley following his death, stating it depicted him with a black eye that he did not have prior to the fight with defendant. Riley also struck defendant in the chest, which caused defendant to fall to his knees. Denika testified defendant "got up like he wanted to square up with [Riley] again" but "then he extended his arm out and shot [Riley]." At the time Riley was shot, he was not lunging toward defendant or reaching into his pocket. According to Denika, Riley fell to the ground, and she went upstairs to get her phone and call the police. She stated Demeisha and defendant drove away from the scene.

¶ 23            On cross-examination, Denika acknowledged an incident "at Christmas" when she and Riley "got into it." She did not believe Demeisha and defendant cared about what happened on Christmas but stated they were upset because Demeisha told defendant that Riley "supposedly sent three girls over there to fight him." Denika further testified that after the shooting, she went to her apartment twice. The first time, she got her phone and her baby. When she returned downstairs, a neighbor took the baby from her, and Denika went back to the apartment to get something for her child. She then rode in the ambulance with Riley to the hospital. On redirect examination, Denika testified defendant "laughed" and "chuckled" when Demeisha told him that Riley sent three girls to fight him. Further, she testified that conversation between Demeisha and defendant occurred a week or two before the shooting.

¶ 24            Hortencia Morales, the sisters' upstairs neighbor, testified with the aid of an interpreter that she observed the December 30, 2018, shooting through her bedroom window. Around 2:30 a.m., she heard screaming and angry voices coming from the area of the building's security gate and a woman yelling " 'stop, stop.' " She then observed a man standing outside of the security gate. The man was wearing a green jacket, which he eventually removed. Morales testified she saw another man exit through the gate and the two men began fighting. According to Morales, both men were yelling and sounded "very angry." The man who had been wearing the green jacket threw the first punch. The men then exchanged punches.

¶ 25            At some point, Morales heard the man who exited the apartment building say " 'come on, come on' " and saw him motioning with his hands. She stated she understood the man to mean he wanted the fight to continue. The man with the green jacket then punched the man who had exited the building. The man who exited the building tried to avoid the punch. Morales testified she then saw him reach for a gun from his right side and shoot the man who had been wearing the

green jacket. According to Morales, the two men were standing approximately six feet apart when the shooting occurred and the man with the green jacket was not moving toward the other man. Additionally, she testified that, at the time of the shooting, there was nothing preventing the man with the gun from walking toward the street or back toward the gate. Morales also stated she never saw the man with the green jacket with any kind of weapon.

¶ 26 After the shooting, Morales called the police. She saw the shooter leave in a vehicle with a woman. Another woman, whom Morales recognized from the building, was standing outside and appeared scared. Morales went downstairs to help, and the woman asked Morales to "go get her baby." Morales stated she went upstairs to get the baby and then brought the baby back downstairs. The woman then asked Morales to take the baby to her apartment and gave Morales the baby with the green jacket worn by the shooting victim. Morales testified it was cold outside and she used the jacket to keep the baby warm. She stated she did not notice any weapons in the jacket and, ultimately, gave it to the police.

¶ 27 On cross-examination, Morales testified she never saw a woman exit the building with a bag and go to a car. She also never saw the shooter with a bag or go toward a car before fighting. Further, Morales stated both men acted as if they wanted to fight. On redirect examination, she testified the man who exited the building acted like he wanted to fight before the first punch was thrown. Morales asserted both men were screaming and yelling and the man from inside had his fists balled and "was the one who approached [the other man] when he exited" the building.

¶ 28 Markeysha West, another upstairs neighbor, testified she also observed the shooting from a window in her apartment. She testified around 1:30 or 1:45 a.m., she heard yelling in an apartment below hers. At some point, the yelling stopped. About 45 minutes later, West heard

someone "banging" on the gate. She looked out her window and saw a man with dreadlocks—which the evidence showed was consistent with Riley's appearance—outside of the apartment building, shouting " 'come outside.' " West then heard a female voice yelling. Shortly after, she saw another male, who appeared to be "bald" or "balding"—which the evidence showed was consistent with defendant's appearance at the time of the shooting. West testified the men began fighting and exchanging blows in the yard of the apartment building. During the fight, she observed a woman exit through the gate and go to a car. The woman put something in the car and then got in the driver's seat.

¶ 29        West testified she observed the men "tussling around the yard" and noted both men stumbled. At some point, she observed the bald man extend his arm toward the area where the gate was located. West believed the man with dreadlocks to be standing in that area, although she could not see him from her vantage point. She heard a gunshot and saw the man with dreadlocks stumble to the ground. The bald man stood over the man with dreadlocks for three to four seconds before getting into the vehicle with the woman and leaving the scene. West estimated the men were standing six to seven feet apart when the shooting occurred. Further, she agreed that the man with dreadlocks was not going toward the bald man at the time of the shooting. Rather, he was "backing up out of [West's] view" when the bald man extended his arm and shot. After the shooting, West observed another woman yelling and kneeling by the man with dreadlocks. On cross-examination, West testified she never saw the bald man with a bag and never saw him go to the car and place a bag inside.

¶ 30        Demeisha testified that she was in a dating relationship with defendant, she cared about him a great deal, and she did not want to testify. She recalled that, prior to the shooting, she and defendant had arguments with Denika about who was allowed in the apartment. Eventually,

the police arrived, and Demeisha spoke with the police while defendant was "getting his stuff ready" to leave the apartment. After the police left, Demeisha heard Riley shouting obscenities outside her apartment window. Defendant wanted to go outside, but Demeisha told him she did not want him to go. In response, defendant told Demeisha "everything was gonna be fine."

¶ 31        Demeisha testified that when she and defendant went downstairs to the gate, Denika was holding the gate shut. Denika was upset and did not want Riley and defendant to fight. Riley was located outside of the gate and was angry and using profanities. Demeisha acknowledged that there was another exit to the apartment building, but she asserted that to get to defendant's car, she and defendant had to exit through the gate. She stated defendant appeared calm but his demeanor changed after Riley threatened that "he would catch [defendant] in the streets." Defendant then pushed past Denika to get through the gate. Demeisha testified she proceeded to the car while defendant and Riley began fighting. She did not know who threw the first punch and stated it appeared "to be a mutual fight" with both men throwing punches. Demeisha did not recall seeing anyone fall to the ground and stated, "it seem[ed] to be a fairly even fight." At some point, she heard a gunshot and defendant came to the car. Demeisha testified she and defendant left the scene and she dropped defendant off at his mother's house. She denied seeing defendant shoot Riley.

¶ 32        On cross-examination, Demeisha testified the gate to the apartment building was not always locked or closed and, sometimes, it would be left propped open. She stated that prior to the fight and the shooting, Riley was outside yelling for defendant to come outside. When she and defendant left the apartment and went downstairs, they waited to see if Riley would leave so they could go to defendant's car. She reiterated that after Riley threatened defendant, defendant exited through the gate, and the men immediately began to fight.

¶ 33        Additionally, Demeisha testified that around Christmas 2018, she witnessed an

argument between Riley and Denika. She stated the two were yelling at one another and she heard Riley threaten "to have the apartment shot up." Demeisha testified defendant was also present at the time and could hear Riley's threat. She recalled another occasion in approximately November or December 2018, when Denika planned to go out with Demeisha and defendant, and Riley took Denika's keys and refused to give them back. Demeisha testified she did not see the two arguing but heard a "thump," which suggested to her that Denika fell against the wall. Denika testified she did not know if Riley pushed Denika.

¶ 34　　　　The State's evidence further showed that following the shooting, the police searched the sisters' Vawter Street apartment. In Demeisha's bedroom closet, the police found a .22-caliber rifle inside a bag and wrapped in the leg of a pair of large pants. The police also searched defendant's parents' house, where they discovered a .22-caliber rifle magazine that matched the rifle found in Demeisha's closet. The magazine was loaded with ammunition and the State's evidence showed the ammunition was the same caliber and had the same markings as the ammunition found in the weapon used to shoot Riley. After defendant was taken into custody, he was found to have a cut on the knuckle of his right index finger. Finally, during the State's case, the parties stipulated that defendant had previously been convicted of a felony offense.

¶ 35　　　　Defendant testified on his own behalf, stating he met Demeisha in August 2018 and the two began dating. Occasionally, he stayed the night at her Vawter Street apartment and, thus, he was also familiar with Denika and Riley. On Christmas Day or Christmas Eve 2018, he heard Denika and Riley arguing at the apartment. During the argument, Riley threatened to have the apartment "shot up." Following the argument, Riley walked aggressively past defendant in the hallway in a way that suggested to defendant that Riley wanted to "bump" defendant's shoulder.

¶ 36　　　　Defendant stated that, prior to the shooting, Demeisha was upset about Riley's

- 13 -

sister being at the apartment. Defendant attempted to talk with Denika about the issue, but she became angry and started yelling and screaming. Demeisha and Denika then argued with one another, and defendant had a conversation with Riley's sister, who then left the apartment. Around 1:45 a.m. the police arrived. Thereafter, defendant decided to go to his parents' home and began gathering his belongings to leave. Eventually, he heard Riley yelling outside the apartment building, saying defendant's name and stating, "bring your b*** a*** outside."

¶ 37    According to defendant, he and Demeisha went downstairs with the intention of getting in defendant's car and leaving. Defendant believed Riley "wanted to engage in some sort of fist fight" but he asserted that was not what he wanted. He stood by the gate "waiting to see *** what was gonna happen[.]" Defendant testified Riley continued to yell, calling him names and saying, " 'come out here.' " He maintained he did not go back to the apartment because he believed that eventually Denika would let Riley enter the building and there was only one door in or out of the apartment. Defendant acknowledged that the apartment building had another exit but stated that would have led him far away from his car, which was parked near Riley.

¶ 38    Defendant testified he decided to exit the gate after Riley stated, " 'I'll catch your b*** a*** in the street.' " That statement indicated to defendant that if Riley did not "get" him that day, he would "get" defendant some other time. According to defendant, Riley also "came up to the gate" and "brandished a firearm." Defendant testified he then pushed the gate, which hit Riley, causing him to take a couple of steps back and drop the gun. Defendant asserted he picked the gun up and he and Riley immediately started fighting with Riley throwing the first punch. He acknowledged that during the fight, he shot Riley, stating as follows:

> "[I]t was a fist fight. And we were punching each other back and forth. But, you know, I started to lose the fight. I started to lose the fight, and I got scared, you

know. I was like, you know, if he knocks me out, then he'll get the gun back, and I don't know if he's gonna shoot me or shoot Demeisha, so I—you know, in order to keep him from knocking me out and getting the gun back, I shot him."

¶ 39    Defendant acknowledged that he did not see "any other weapons" on Riley when he shot the gun. However, he asserted Riley "was coming towards [him] and moving at [him] because [they] were engaged in a fight." After the shooting, defendant "threw the gun down." He stated he did not want to take the gun with him and he was not afraid Riley would get the gun because "he was on the ground." When asked whether there was anything he could have done to get himself out of the situation other than shoot at Riley, defendant stated that in hindsight, he "could have called an Uber or something[.]" However, in the heat of the moment, he felt like there was nothing else he could have done.

¶ 40    On cross-examination, defendant reiterated that Riley flashed a firearm before he exited the gate. He stated Riley was holding the gun in his right hand. Defendant asserted that when he pushed open the gate, the gate hit Riley in the face, and Riley dropped the gun. Defendant picked the gun up and fought Riley while holding the gun in his hand. Defendant maintained he and Riley were "close" to one another when the shooting occurred and were "actively *** fighting." Defendant additionally testified that the gun used in the shooting belonged to Denika. He maintained Denika previously showed him the gun while telling him a story about problems she was having another person and she explained to him how to use the gun.

¶ 41    Defendant denied that the ammunition in the gun was his or that the gun found in Demeisha's bedroom belonged to him. He also denied that the magazine and ammunition found at his parents' house belonged to him and asserted he did not know whose it was.

¶ 42    Ultimately, the jury found defendant guilty of both first degree murder and unlawful

- 15 -

possession of a weapon by a felon. On March 11, 2020, defendant filed a motion for an acquittal or, in the alternative, a motion for a new trial. Relevant to this appeal, he argued the trial court erred by partially denying his motion to introduce evidence of Riley's propensity for violence and allowing the State's motion to admit Denika's recorded statements at the hospital as an excited utterance. On March 30, 2020, defendant also filed a motion in arrest of judgment as to count V, charging him with unlawful possession of a weapon by a felon, on the basis that the charge did not indicate or describe the weapon he was alleged to have unlawfully possessed.

¶ 43    In June 2020, the trial court denied defendant's posttrial motion for a new trial or an acquittal but granted his motion for an arrest of judgment as to count V. The court vacated the jury's finding of guilt as to that count, and it was later dismissed on the State's motion. Following a sentencing hearing, the court sentenced defendant to 55 years in prison. Defendant filed a motion to reconsider, which the court ultimately denied.

¶ 44    This appeal followed.

¶ 45                            II. ANALYSIS

¶ 46                    A. The Victim's Propensity for Violence

¶ 47    On appeal, defendant first argues the trial court erred by excluding evidence of Riley's propensity for violence. Specifically, he contends the court improperly barred him from presenting evidence that Riley had "previously been aggressive and violent" toward Sherri Carlton, Denika and Demeisha's mother. He maintains such evidence was critical to his claim of self-defense and its exclusion deprived him of his constitutional right to present a complete defense.

¶ 48    There are two purposes for which evidence of a victim's aggressive and violent character may be relevant to support a theory of self-defense. *People v. Lynch*, 104 Ill. 2d 194,

- 16 -

199-200, 470 N.E.2d 1018, 1020 (1984). "First, the defendant's knowledge of the victim's violent tendencies necessarily affects his perceptions of and reactions to the victim's behavior." *Id.* at 200. Thus, "the evidence is relevant to show the defendant's state of mind—that [the] defendant acted reasonably in acting in self-defense." *People v. Yeoman*, 2016 IL App (3d) 140324, ¶ 28, 58 N.E.3d 136. Under this first purpose, evidence of a victim's character is irrelevant to a self-defense theory "unless the defendant knew of the victim's violent nature." *Lynch*, 104 Ill. 2d at 200.

¶ 49        The second purpose for admitting evidence of a victim's aggressive and violent character is "to support the defendant's version of the facts where there are conflicting accounts of what happened." *Id.* "In other words, the evidence is relevant to support the defendant's claim that the victim was the aggressor." *Yeoman*, 2016 IL App (3d) 140324, ¶ 29. It does not matter whether the defendant knew of the evidence of the victim's propensity for violence. *Lynch*, 104 Ill. 2d at 200 ("[W]hen the theory of self-defense is raised, the victim's aggressive and violent character is relevant to show who was the aggressor, and the defendant may show it by appropriate evidence, regardless of when he learned of it.").

¶ 50        Ultimately, "[t]he determination of whether evidence is relevant and admissible is in the sound discretion of the trial court and will not be reversed on appeal absent an abuse of that discretion." *Yeoman*, 2016 IL App (3d) 140324, ¶ 27. "The threshold for finding an abuse of discretion *** is a high one and will not be overcome unless it can be said that the trial court's ruling was arbitrary, fanciful, or unreasonable, or that no reasonable person would have taken the view adopted by the trial court." *Id.*

¶ 51        Here, the record shows defendant filed a pretrial motion seeking to present evidence of Riley's propensity for violence. His allegations included a claim that Riley was involved in a physical altercation with Sherri in 2018, during which Riley pulled Sherri's hair and grabbed and

- 17 -

scratched her neck. During hearings on the motion, defendant presented a defense investigator's recorded interviews with Sherri and Demeisha to support his allegations. During her recorded interview, Sherri described Riley as "disrespectful" and "mean." She stated he often yelled, called her names, and talked bad about her to others. When asked if Riley ever had "any physical contact with [her]," Sherri asserted that on one occasion he pushed her, pulled her hair, and scratched her neck. She also indicated that Demeisha had to break up their "fight." The record reflects Demeisha similarly reported having to "break *** up" a "physical altercation" between Riley and Sherri. She indicated, however, that Riley "was just trying to get [Sherri] up off of him" and stated Sherri had been "drunk" and "started the whole altercation." Neither Sherri nor Demeisha provided statements regarding when that altercation occurred.

¶ 52    Ultimately, the trial court granted defendant's pretrial motion in part, allowing defendant to present some evidence of Riley's propensity for violence but denying his request to present evidence of the physical altercation involving Sherri. The court reasoned that although such a confrontation could be relevant, "more specific representations" were needed regarding "who initiated that altercation." The court also noted that from Sherri's interview, it was "very uncertain as to when, where that took place." The record reflects no abuse of discretion by the court.

¶ 53    Initially, the evidence presented by defendant to support his motion calls into question whether the physical altercation between Riley and Sherri would have supported a finding of Riley's aggressive or violent character. During the recorded interviews, Sherri provided almost no context for the physical altercation, and the context provided by Demeisha suggested that Sherri was the aggressor and Riley was trying to defend himself. Additionally, defendant points to no evidence in the record that he was present for that physical altercation or that he had any knowledge

- 18 -

that it had occurred. Thus, there is nothing in the record to support a finding that such evidence would have been relevant to his state of mind at the time of the shooting. Finally, we note the record shows the trial court expressed a willingness to reconsider its ruling upon defendant's ability to "make an offer of proof and provide some additional foundational specificity." Defendant never availed himself of that opportunity, and based on the evidence that was presented, we do not find that the court's ruling was arbitrary, fanciful, or unreasonable.

¶ 54                                    B. Excited Utterance Exception

¶ 55        On appeal, defendant next argues the trial court abused its discretion by allowing Denika's audio recorded statements to the police to be admitted under the excited utterance exception to the hearsay rule. He contends Denika's statements were not spontaneous because they were made more than two hours after the shooting, she had conversations with others before making her recorded statements, and her recorded statements were made in response to police questioning. Defendant further argues that the prejudicial effect of the recorded statements far outweighed their probative value and that the State cannot establish that the improper admission of the statements was harmless error.

¶ 56        " 'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Ill. R. Evid. 801(c) (eff. Oct. 15, 2015). Generally, hearsay evidence is not admissible at trial. Ill. R. Evid. 802 (eff. Jan. 1, 2011). However, exceptions to the hearsay rule exist, including one for excited utterances, which are often also referred to as spontaneous declarations. Ill. R. Evid. 803(2) (eff. Sept. 28, 2018); *People v. Sutton*, 233 Ill. 2d 89, 107, 908 N.E.2d 50, 62 (2009).

¶ 57        An excited utterance is defined as "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or

- 19 -

condition." Ill. R. Evid. 803(2) (eff. Sept. 28, 2018). For a statement to be admitted under the excited utterance exception, a trial court must find (1) the existence of "an occurrence sufficiently startling to produce a spontaneous and unreflecting statement," (2) that there was an absence of time for fabrication, and (3) that the declarant's statement relates to the circumstances of the occurrence. *Sutton*, 233 Ill. 2d at 107. When analyzing whether a statement falls within the exception, courts should consider the totality of the circumstances, including "time, the mental and physical condition of the declarant, the nature of the event, and the presence or absence of self-interest." *Id.*

¶ 58        "The period of time that may pass without affecting the admissibility of a statement varies greatly." *Id.* "The critical inquiry with regard to time is whether the statement was made while the excitement of the event predominated." (Internal quotation marks omitted.) *Id.* at 107- 08; see also *People v. Connolly*, 406 Ill. App. 3d 1022, 1025, 942 N.E.2d 71, 76 (2011) ("While the amount of time necessary for fabrication may vary greatly, the critical inquiry with regard to time is whether the statement was made while the declarant was still affected by the excitement of the event."). Additionally, other factors for consideration when determining admissibility include whether the statement was made after the declarant previously spoke to another or in response to questioning of the declarant. See *People v. House*, 141 Ill. 2d 323, 386, 566 N.E.2d 259, 287 (1990) (stating there is no *per se* rule "that a declarant cannot make a spontaneous declaration to a person after having spoken previously to another" and such an occurrence "is merely a factor to consider in determining admissibility"); *People v. Sommerville*, 193 Ill. App. 3d 161, 174, 549 N.E.2d 1315, 1325 (1990) ("[T]he fact that the statement was made in response to a question does not automatically negate the statement's spontaneity, but instead is a factor to be considered.").

¶ 59        "A trial court's evidentiary rulings on hearsay testimony and any applicable

exceptions are reviewed under an abuse-of-discretion standard." *People v. Burney*, 2011 IL App (4th) 100343, ¶ 40, 963 N.E.2d 430. "An abuse of discretion will be found only where the trial court's ruling is arbitrary, fanciful, unreasonable, or where no reasonable person would take the view adopted by the trial court." (Internal quotation marks omitted.) *Id.*

¶ 60 Here, there is no dispute that the statements at issue were made after a startling event, a shooting following which the victim died. Denika's statements also unquestionably concerned the circumstances surrounding that shooting. The record also shows Denika was upset and emotional, which tends to suggest she remained under the effects of the startling event. Ultimately, however, when considering the totality of the circumstances, we find there are critical facts that weigh against finding Denika's statements admissible. In particular, we note Denika spoke with at least two other individuals about the shooting before making her recorded statements and her recorded statements were elicited by police questioning.

¶ 61 In *Sommerville*, 193 Ill. App. 3d at 174, hearsay statements admitted under the excited utterance exception were found to be problematic because they resulted from "a series of questions," which caused "doubt as to whether the statements were actually 'spontaneous.' " In that case, the declarant reported a sexual assault to her fiancé, who then asked the declarant multiple questions about what had occurred. *Id.* As a result, the declarant "repeated her account of the alleged sexual assault to her fiancé several times ***." *Id.* at 175. The Second District distinguished case authority that involved only a single question to the declarant regarding " 'what happened,' " and stated as follows: "It is our opinion that the detailed repetition of answers to the successive questions asked removed the spontaneity and immediacy required for spontaneous declarations." *Id.* The court also found that the spontaneity of a subsequent statement the declarant made to a police officer was destroyed because it occurred after a "previous discussion with her

- 21 -

fiancé." *Id.*; See also *People v. Robinson*, 73 Ill. 2d 192, 199, 383 N.E.2d 164, 168 (1978) (finding challenged hearsay statements were not spontaneous declarations where the statements were made to a police officer after the declarant "had discussed the crime" with family members); *People v. Davis*, 130 Ill. App. 3d 41, 56, 473 N.E.2d 387, 399 (1984) (holding statements were not spontaneous declarations where they "were repetitions made some time after the event and in response to questioning"); *People v. Victors*, 353 Ill. App. 3d 801, 809-10, 819 N.E.2d 311, 319 (2004) (finding out-of-court statements were not excited utterances and there had possibly been an opportunity for the declarant "to reflect on her statements" because they were made after the declarant was questioned for approximately five minutes by a "backup officer").

¶ 62        In this case, Denika's statements were made approximately two hours after the shooting and about one hour after Riley was pronounced dead. She had been waiting at the hospital where Riley had been transported after the shooting. During that time, she provided accounts of the shooting to both another police officer and a friend who was present at the hospital "for support." Moreover, during her recorded statement, Denika primarily answered questions posed by the police officers, including specific questions about the shooter and his vehicle and the events leading up to the shooting. We find the above circumstances reflect a lack of spontaneity and suggest there was time for reflection before the challenged statements were made. We hold Denika's recorded statements did not properly fall within the excited utterance exception to the hearsay rule and the trial court erred by allowing their admission.

¶ 63        Although we find the trial court abused its discretion by allowing the admission of Denika's recorded hearsay statements, we ultimately agree with the State that the improper admission of those statements was harmless error. " 'The admission of hearsay evidence is harmless error where there is no reasonable probability that the jury would have acquitted the

- 22 -

defendant absent the hearsay testimony.' " *People v. Sims*, 192 Ill. 2d 592, 628, 736 N.E.2d 1048, 1067 (2000) (quoting *People v. Nevitt*, 135 Ill. 2d 423, 447, 553 N.E.2d 368, 377 (1990)). In this case, the State presented substantial and convincing evidence of defendant's guilt.

¶ 64        The evidence at trial showed Riley became verbally aggressive toward defendant, threatening him and challenging him to a fight. The evidence suggests that in response to Riley's verbal aggression, defendant, while armed with a firearm, willingly engaged in a physical altercation with Riley. During the fight, defendant pulled out the gun and shot Riley. Witness testimony indicated the shooting occurred while the men were several feet apart and Riley was not moving toward defendant. One witness testified defendant told Riley to "come on" and motioned with his hands shortly before the shooting occurred. Defendant's assertions that Riley introduced the gun into the conflict and that he fought Riley after disarming him and while holding the gun in his hand were not supported by any other evidence. None of the four eyewitnesses to the shooting observed Riley with a gun or reported seeing defendant with a gun in his hand until the moment of the shooting. After the shooting, defendant fled the scene. Additionally, the ammunition in the murder weapon was the same as ammunition found at defendant's parents' house, inside the magazine of another weapon.

¶ 65        We find defendant's claims of self-defense were seriously undermined by the evidence presented, including his willingness to engage in a physical fight with Riley, evidence that he was the one who introduced the gun into the conflict, and eyewitness statements that the men were separated by at least several feet at the time of the shooting and that Riley was not moving toward defendant. Under these circumstances, we find there is no reasonable probability that the jury would have acquitted defendant absent Denika's recorded hearsay statements.

¶ 66                    C. Prosecutor's Statements During Closing Argument

¶ 67 Finally, on appeal, defendant argues the prosecutor misstated the law during closing arguments, denying him a fair trial. He contends the prosecutor improperly argued that he had a duty to retreat from a conflict with Riley before any such duty could possibly have existed, *i.e.*, before he could have been deemed the aggressor. Defendant acknowledges that he failed to preserve this issue for appellate review because he did not object to the prosecutor's closing argument at trial and he failed to include an objection to the prosecutor's comments in his posttrial motion. Nevertheless, he maintains the issue may be properly addressed under the plain-error doctrine or because his counsel was ineffective for failing to raise an objection.

¶ 68 "To preserve a purported error for consideration by a reviewing court, a defendant must object to the error at trial and raise the error in a posttrial motion." *People v. Sebby*, 2017 IL 119445, ¶ 48, 89 N.E.3d 675. The failure to take either step results in forfeiture of the issue on review. *Id.* However, this court may excuse defendant's forfeiture under the plain-error doctrine when "a clear or obvious error occurred" and either (1) "the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error," or (2) the "error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." (Internal quotation marks omitted.) *Id.* "The initial analytical step under either prong of the plain error doctrine is determining whether there was a clear or obvious error at trial." *Id.* ¶ 49.

¶ 69 Additionally, an ineffective-assistance-of-counsel claim is evaluated under the two-prong test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). *People v. Gayden*, 2020 IL 123505, ¶ 27, 161 N.E.3d 911. "Under the *Strickland* test, a defendant must establish both that counsel's performance fell below an objective standard of reasonableness and that a reasonable

probability exists that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* "The failure to establish either prong of the *Strickland* test precludes a finding of ineffective assistance of counsel." *Id.*

¶ 70 During closing argument, prosecutors are generally accorded wide latitude. *People v. Runge*, 234 Ill. 2d 68, 142, 917 N.E.2d 940, 982 (2009). "They may comment on the evidence and on any fair and reasonable inference the evidence may yield." *Id.* "[A]n attorney may not misstate the law in closing argument." *People v. Ramsey*, 239 Ill. 2d 342, 441, 942 N.E.2d 1168, 1223 (2010). "Reviewing courts will consider the closing argument as a whole, rather than focusing on selected phrases or remarks, and will find reversible error only if the defendant demonstrates that the improper remarks were so prejudicial that real justice was denied or that the verdict resulted from the error." *Runge*, 234 Ill. 2d at 142.

¶ 71 Further, in the context of a self-defense claim, "whether the defendant was the initial aggressor, *i.e.,* the one who provoked the fatal confrontation, is a question of fact to be decided by the trier of fact." *People v. De Oca*, 238 Ill. App. 3d 362, 367, 606 N.E.2d 332, 336 (1992). "Conduct which may qualify a defendant as the initial aggressor includes the act of pointing a loaded gun [citations] or even the mere utterance of words [citations]." *Id.*

¶ 72 "A non-aggressor has no duty to retreat, but he does have a duty not to become the aggressor." *In Interest of D.N.*, 178 Ill. App. 3d 470, 475, 533 N.E.2d 84, 88 (1988); see also *People v. Nunn*, 184 Ill. App. 3d 253, 269, 541 N.E.2d 182, 193 (1989) (stating "if one responds with such excessive force that one is no longer acting in self-defense but in retaliation, said excessive use of force renders one the protagonist; a non-aggressor has a duty not to become the aggressor"); *De Oca*, 238 Ill. App. 3d at 367 ("[A] nonagressor has a duty not to become the aggressor."). Additionally, "[a]lthough there is no duty to retreat in the face of a wrongdoer

[citation], the ease of the defendant's escape from his assailants *** would support the conclusion that he was unreasonable in believing that he had to use such deadly force to defend himself." *People v. Martinez*, 4 Ill. App. 3d 1072, 1076, 283 N.E.2d 268, 271 (1972).

¶ 73        As stated, defendant argues the prosecutor improperly argued to the jury that he had a duty to retreat before he could have been considered an aggressor in the conflict with Riley. Here, the record shows that during closing arguments, the prosecutor argued defendant was the aggressor in the confrontation between himself and Riley when he "burst[ ] through the gate." The prosecutor further asserted as follows:

> "A person who initially provokes the use of force against himself is justified in the use of force only if the force used against him is so great that he reasonably believes he is in imminent danger of death or great bodily harm and—this part is key—he has exhausted every reasonable means to escape the danger other than the use of force which is likely to cause death or great bodily harm to the other person. He's got to exhaust all means to escape. And he clearly did not. He could have gone in the car. There was nothing between him and Demeisha's car; right? He could have just got in the car. He could have left. *He could have not gone through the gate in first place, first of all. Could have just stayed there. He could have called the police. He could have gone out the back door and called an Uber, which he clearly testified that he was more than capable of doing. He had many other options other than joining in this fight; right?* And he had a gun in his pocket. He could have taken the gun out and pointed it out at him. If he really thought he needed to stop this fight, he could have just pointed it at him. He was six feet, seven feet away. He could have just pointed it at him and said, stop, or I'll shoot you; right? [Riley] would

- 26 -

have stopped. He could have shot it in the air. He could have done—he had so many other options, but he was not interested in any of those other options or means to escape because what he was interested in doing was aiming at [Riley's] chest and pulling the trigger. ***

*** 

So everything has been proven. First proposition, clearly, he performed the acts. The second, clearly he intended to do great bodily harm, he shot him in the chest. And, third, there was no justification for using deadly force. He didn't exhaust the means to escape. He had many other options. [Riley] was not charging him. There was no imminent threat to him at all. His argument that maybe if he knocks me out and disarms me, then he would use deadly force is not a reasonable argument by any means. So all three of these have been proven beyond a reasonable doubt. You should find him guilty of first degree murder." (Emphasis added.)

¶ 74 Initially, we find evidence showing that defendant could have avoided any conflict with Riley—by staying in the apartment, calling the police, taking another exit, or remaining inside the gate—was relevant to issues in the case, including defendant's credibility, his state of mind and, as the State argues, whether he intended to provoke Riley into using force. Thus, the prosecutor could properly comment on such evidence during closing argument. Additionally, when viewing the prosecutor's closing argument as a whole, the record suggests he was using evidence that showed defendant could have easily avoided Riley to support the contention that defendant left the sisters' apartment with the intention of fighting. The prosecutor argued defendant "was going down there to fight," defendant could have gone "upstairs and call[ed] the police if he really was that worried," defendant "wasn't trying to leave. He was trying to fight," and "defendant was

coming down there to fight and he brought his gun with him." See *People v. White*, 265 Ill. App. 3d 642, 651, 638 N.E.2d 314, 320-21 (1994) (rejecting an argument that the defendant's counsel was ineffective for failing to object to the prosecutor's argument referencing the defendant's failure to take evasive actions because "the argument was primarily addressed to the credibility of the defendant, and was not an argument designed to imply that the defendant had a legal duty to retreat").

¶ 75        However, even assuming the challenged portion of the prosecutor's argument was improper because it suggested defendant had a *duty* to escape or retreat before he became the aggressor, defendant cannot demonstrate either plain error or ineffective assistance of counsel. When a prosecutor's improper remarks are at issue, reversible error occurs if the remarks "constituted a material factor in a defendant's conviction." *People v. Wheeler*, 226 Ill. 2d 92, 123, 871 N.E.2d 728, 745 (2007). "If the jury could have reached a contrary verdict had the improper remarks not been made, or the reviewing court cannot say that the prosecutor's improper remarks did not contribute to the defendant's conviction, a new trial should be granted." *Id.*

¶ 76        In this case, we note the challenged comments were brief, consisting of only a few sentences. Further, the record shows the jury was properly instructed on the law. The jury received instructions regarding an initial aggressor's use of force, which stated as follows:

> "A person who initially provokes the use of force against himself is justified in the use of force only if the force used against him is so great that he reasonably believes he is in imminent danger of death or great bodily harm and he has exhausted every reasonable means to escape the danger other than the use of force which is likely to cause death or great bodily harm to the other person."

The jury was also instructed that a non-aggressor "has no duty to attempt to escape the danger

- 28 -

before using force against the aggressor" and that a person is not justified in using "force if he initially provokes the use of force against himself with the intent to use that force as an excuse to inflict bodily harm upon the other person." Finally, the evidence in the case was not closely balanced. Rather, as already discussed, the State presented strong evidence of defendant's guilt, and defendant's own version of events was not supported by the evidence.

¶ 77        Under these circumstances, we cannot say the alleged improper comments constituted a material factor in defendant's conviction or resulted in an unfair trial. *People v. Johnson*, 114 Ill. 2d 170, 199, 499 N.E.2d 1355, 1368 (1986) ("In view of the entire record and the overwhelming evidence of [the] defendant's guilt, we cannot say that the improper comment either constituted a material factor in defendant's convictions or otherwise prevented him from receiving a fair trial so as to require reversal."). Accordingly, we find neither reversible error nor plain error. *People v. Naylor*, 229 Ill. 2d 584, 602, 893 N.E.2d 653, 665 (2008) ("Absent reversible error, there can be no plain error."). Additionally, for the same reasons, defendant cannot show prejudice and, thus, cannot establish the ineffective assistance of his defense counsel.

¶ 78                                III. CONCLUSION

¶ 79        For the reasons stated, we affirm the trial court's judgment.

¶ 80        Affirmed.