2022 IL App (3d) 200007

Opinion filed May 13, 2022

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2022

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of the 14th Judicial Circuit, Rock Island County, Illinois. |
| Plaintiff-Appellee, | ) ) | Appeal No. 3-20-0007 |
| v. | ) ) | Circuit No. 18-CF-1104 |
| JOSE YANEZ, | ) ) | The Honorable Norma Kauzlarich, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE HOLDRIDGE delivered the judgment of the court, with opinion.
Justice Schmidt and Justice Hauptman concurred in the judgment and opinion.

_____

**OPINION**

¶ 1    After a jury trial, the defendant, Jose Yanez, was convicted of second degree murder (720

ILCS 5/9-2(a) (West 2018)) and domestic battery. He was sentenced to 15 years' imprisonment

and 2 years of mandatory supervised release. On appeal, Yanez argues that no rational trier of

fact could have found him guilty of second degree murder beyond a reasonable doubt because he

had acted reasonably and with justification in using lethal force against the victim in defense of

himself, his 14-year-old nephew, and his dwelling. He also argues that his trial counsel provided

ineffective assistance by failing to present evidence of the victim's violent criminal background

in support of Yanez's self-defense theory. Yanez requests that we reverse his conviction and remand the cause for a new trial. In the alternative, Yanez argues that his sentence was excessive and asks us either to reduce his sentence or to remand to the trial court for resentencing.

¶ 2                                                           BACKGROUND

¶ 3        The State charged Yanez for the second degree murder of Antonio Ortiz and the domestic battery of Candice Rangel.[1] Yanez killed Ortiz in the early morning of December 16, 2018. Yanez waived a jury trial and requested a bench trial.

¶ 4        During the trial, Rangel, Ortiz's sister, testified for the State. Rangel testified that, at the time of the incident in question, she was living with Yanez and had been dating him for five years. On December 15, 2018, Rangel was at her house with Yanez and his 14-year-old nephew, Julian Cortez Morales Vicuna (Julian). Sometime that evening, the three of them went to Rangel's cousin's house to watch a fight. After the fight, Yanez and Rangel took Julian back to their home. Rangel and Yanez then went to a bar with a group of friends where they drank until approximately 3 a.m. They then went back to Rangel's cousin's house, where they stayed for approximately 30 minutes to an hour before returning home

¶ 5        When they returned home, Rangel and Yanez were both intoxicated. At some point, they got into an argument that turned physical. Rangel could not remember much about the fight. However, she testified that Yanez struck her across the face with his open hand, causing her nose to bleed.

¶ 6        Rangel then went to her brother Ortiz's house, which was approximately a block and a half away. While there, Rangel cleaned up her face with paper towels and lay down. When Ortiz

---

[1]Yanez appeals his conviction for second degree murder, but he has not appealed his domestic battery conviction.

2

and his wife arrived home, Ortiz saw the bloody paper towels and asked Rangel what had happened. Ortiz asked Rangel, "did he hit you?" Rangel told Ortiz that it was fine and to let it go. Rangel stated that Ortiz was intoxicated at that time and she was concerned that Ortiz would confront Yanez about the incident. Rangel then went to sleep. When she woke up a while later, Ortiz's wife was sitting with her. She told Rangel that Ortiz had left. On cross-examination, Rangel admitted that Ortiz and Yanez had a confrontation about prior fights that Rangel had had with Yanez.

¶ 7        Kaleigh Polley also testified for the State. Polley had been friends with Rangel for approximately 13 years, and she knew both Yanez and Ortiz. Polley testified that, on the evening of December 15, 2018, she joined a group of people at Alfredo's (Rangel's cousin's) house to watch a fight. Both Yanez and Ortiz were there. Thereafter, Polley went with Yanez and Rangel to drop Julian off at their home. The three of them then went to a few bars until approximately 2 or 3 a.m. and then returned to Alfredo's to drink. Yanez and Rangel left Alfredo's before Polley did.

¶ 8        At approximately 4 or 4:30 a.m., Polley left Alfredo's and went to Ortiz's house. Rangel was already there. Polley testified that, when Ortiz noticed bloody paper towels, he asked Rangel questions. Ortiz then went to Yanez's house. Polley followed him because she was concerned that there was going to be an altercation and that Ortiz might end up going to jail. She wanted to "make [Ortiz] go back home" because "he didn't need to be going over there." Polley accompanied Ortiz to Yanez's house, where she saw Ortiz open the door to the porch, enter the porch, and begin banging on the front door to the house. Polley and Ortiz left when Yanez's mother pulled up to the house shortly before 5 a.m. (Polley stated that Yanez's mother had come to Yanez's house at

3

that time because Yanez had texted her.) Polley and Ortiz then walked back to Ortiz's house together.

¶ 9    Polly testified that, when Ortiz returned home 10 minutes later and saw Rangel for a second time, he got upset and left the house again. This time, Polley stayed back to call Ortiz's mother. Polley then followed Ortiz, but he was ahead of her and she lost sight of him when he crossed the street. When she arrived at Yanez's house, Polly found Ortiz lying on the front yard with blood on his shirt. She saw a stab wound on Ortiz's chest. She called Ortiz's mother and then called 911. On cross-examination, Polley stated that she did not see anything happen to Ortiz but could hear banging on the door before she found him.

¶ 10    The State also called Julian.  Julian testified that he spent the night of December 15-16, 2018, at Yanez's house. Julian, Yanez, and Rangel went to see a fight that night, after which Julian was taken back to Yanez's house. After they dropped Julian off, Yanez and Rangel went out for approximately two to three hours and returned in the morning. When Yanez and Rangel returned home, Julian was sleeping on an air mattress in the living room near the front door. He later heard arguing in the bedroom, after which Rangel stormed out of the house. Yanez was upset when Rangel was leaving the house, and he told her "you are not coming back." Yanez then sat at the table.

¶ 11    Julian testified that he later heard pounding at the door. He was on the air mattress in front of the door when the pounding began. Yanez was sitting at the table and told the person at the door to go home. Julian stated that he heard pounding a second time, which sounded harder than the first time. He testified that he got up and walked away from the door at that point, and he and Yanez began discussing whether they should call the police because "the second time it sounded even more aggressive." Julian stated that he told Yanez, "we should call the cops," but Yanez

4

said "no, he probably—he won't get in here; everything will get cooled down. He'll probably just cool off and everything." Julian testified that the person banging at the door said, "[i]'m going to fuck you up." At that point, Julian recognized the person's voice as someone who was at the fight earlier. Julian then saw Yanez with a knife in his hand.

¶ 12    Julian further testified that, approximately 10 or 20 minutes later, he heard a third knock at the door. This time, the knocking was even harder than before, and Julian heard the glass of the door breaking. When Julian heard the glass break, he crawled off the air mattress towards the table where Yanez was sitting. Yanez told Julian to call the police, but Julian was unable to do so.

¶ 13    During cross-examination, Julian testified that the person who knocked at the door did not say anything the first time he knocked. After the first knock, Yanez told Julian "he's out there, we are in here; just let him knock, he's going to go home." The person at the door left, and Yanez said that it was "Antonio."

¶ 14    Julian further testified that, after the second knock, he was scared and Yanez looked startled, a little bit paranoid, and very worried. At that point, Yanez began saying that there were a couple of knives and was telling Julian what he would do to Antonio if he came into the house. Yanez told Julian that Julian would have to help him if Antonio got Yanez on the ground, and he suggested that Julian might want to have a weapon handy. Yanez told Julian to call the police, and Julian tried to call them, but he was unable to make the call because he was too nervous. Julian was scared because he thought that "this guy didn't come here to get a glass of milk and cookies. He's going to try to do something to us."

¶ 15    Julian tried to lie back down after the second round of knocking stopped, but the knocking began again. While Julian was on the couch, he heard the glass of the door break. Julian saw the

5

glass break all the way through, and he believed that Antonio was trying to come in the front door. Julian feared that he was going to "do bad things to us." Julian was on his hands and knees. At that time, Yanez went toward the door and stabbed the victim. Yanez then came back into the room and called the police.

¶ 16    Julian confirmed that Yanez grabbed knives between the second and third time that the victim knocked on the door. He further clarified that, after the first round of knocking, Yanez was calm and he reassured Julian that Antonio would not get in the house and that he would probably cool off. After the second, more aggressive knock, however, Yanez grabbed the knives, told Julian to call the police, and began discussing what they should do if Antonio entered the house. Julian described the third round of knocking as a "pounding." When asked whether the third knocks were "very aggressive," Julian responded, "[a]bsolutely."

¶ 17    The State then called Detective Phillip Anderson of the Rock Island Police Department. Anderson was assigned to investigate Ortiz's death. Anderson testified that Yanez's residence had an enclosed front porch with a door that led to the outside. There was a door inside the porch that led into the home. That door had a pane which was broken on the lower left corner.

¶ 18    Anderson and another detective interviewed Yanez at the police station. Anderson testified that, during the interview, Yanez told Anderson that he had gone to a fight, then to a bar, and then went home with Rangel. He had argued with Rangel, and she left the house. Yanez told Anderson that Ortiz had been to his home several times on previous occasions. Yanez had called the police around 5:20 a.m., after the final time that Ortiz knocked on the door. When Anderson asked him why he had not called the police sooner, Yanez responded that he "didn't think that the police would be able to do much; maybe have [Ortiz] in jail overnight, but he would still have

6

to deal with it and that he didn't want to be labeled as a snitch." Anderson further testified that Yanez was five feet, seven inches tall, whereas Ortiz was over six feet tall.

¶ 19    The parties stipulated to the admission of an autopsy report on Ortiz. The report identified the cause of death as a single stab wound to the chest. It listed Ortiz's weight at 280 pounds.

¶ 20    The State moved to admit into evidence the 911 calls placed by Yanez and Polley, as well as a video of the incident that had been taken by Yanez's home surveillance system. Both were admitted without objection from the defense. Among other things, the video shows (1) Yanez asking Julian to call the police without success; (2) Ortiz breaking the glass window in the front door and attempting to open the door while demanding to know whether Yanez had hit Ortiz's sister; (3) Yanez then approaching the door and stabbing Ortiz a single time; and (4) Yanez calling 911 and telling the dispatcher that he stabbed a crazy person who tried to break into his house.

¶ 21    After the State rested, Yanez's counsel moved for a directed verdict, arguing that the State could not overcome the affirmative defenses of self-defense (720 ILCS 5/7-1 (West 2018)) and defense of dwelling (720 ILCS 5/7-2 (West 2018)) that Yanez had asserted before and during the trial. The State responded by arguing that the evidence, as seen in a light most favorable to its case, showed Yanez's actions to be unreasonable. The trial court denied Yanez's motion for directed finding. In so ruling, the trial court noted that it had relied on the video as the principal piece of evidence.

¶ 22    Yanez's counsel recalled Anderson to testify for Yanez. Anderson testified that, during his interview with the police, Yanez told the detectives that he felt that he and Julian would be assaulted or beaten up by Ortiz once Ortiz made it through the door. Anderson stated that Yanez told him that Yanez and Ortiz "had words" on a previous occasion about Yanez having put his

7

hands on Rangel. Anderson believed that "there was some shoving involved" during that altercation but that Yanez and Ortiz had made up the following morning.

¶ 23    Yanez did not testify. After hearing arguments from both parties, the trial court took the matter under advisement. The court later found Yanez guilty of second degree murder and domestic battery. As to the charge of second degree murder, the trial court found that Yanez was not the aggressor in the incident and that he was not required to call the police. The trial court stated that it had "heard no testimony or evidence that Mr. Ortiz had an aggressive or a violent character." The trial court noted that Julian wanted to go home but that the defendant said "[w]hat if we go outside *** and may be killed? What are you, a weak ass little bitch, or are you a dude?" The trial court told Yanez that "you evidently find this amusing, *** because in the recording, you are smirking." The court found that there was "no imminent danger of death or harm to [Yanez]." Further explaining its ruling, the trial court stated:

> "You had all kinds of time, Mr. Yanez, and there's the problem. Because the third time that Mr. Ortiz comes back when he's pounding and I can hear the glass crack, it looks like perhaps he picks something up to break the window, he does reach in, and as you head to the door, he steps back and he stands like this [gesturing]. He doesn't have anything in his hands. He's not reaching into the window, and he starts saying stuff about: You got to be hitting my sister? And you stab him. And he says: Why you got—why you got to be stabbing me? *** That's not self-defense, sir. That is you lying in wait for him to come back. He broke the window. That's criminal damage to property. The third time, yeah, 'I'm going to fuck your assup', but you had all kinds of time. You spent that time scaring Mr.

8

Julian to death, but you weren't scared. And you kept saying: Nothing ain't gonna happen. It's all right, man. Everything's gonna calm down. It's all right, man."

¶ 24 Yanez filed a motion to reconsider, arguing that Ortiz broke through the window in a violent matter and tried to reach through the broken window to unlock the door. In his motion, Yanez reasserted the affirmative defenses of self-defense and defense of a dwelling, and he asked the trial court to reconsider its decision in light of Yanez's right to defend his nephew. The trial court denied Yanez's motion to reconsider.

¶ 25 Yanez's sentencing hearing took place immediately thereafter. The trial court sentenced Yanez to 15 years' imprisonment with 2 years mandatory supervised release. This appeal followed.

¶ 26 ANALYSIS

¶ 27 Yanez argues that the trial court erred by rejecting his defenses of self-defense and defense of a dwelling. In reviewing this issue, we must determine whether, after considering the evidence in the light most favorable to the State, any rational trier of fact could have found beyond a reasonable doubt that the defendant did not act justifiably in self-defense or in defense of himself and Julian in his dwelling. *People v. Gray*, 2017 IL 120958, ¶ 51.

¶ 28 We will address only Yanez's defense of a dwelling claim because we find it to be dispositive. "[A] man's habitation is one place where he may rest secure in the knowledge that he will not be disturbed by persons coming within, without proper invitation or warrant, and that he may use all of the force apparently necessary to repel any invasion of his home." *People v. Eatman*, 405 Ill. 491, 498 (1950). Section 7-2(a) of the Criminal Code of 2012 (Code) provides, in relevant part:

"(a) A person is justified in the use of force against another when and to the extent that he reasonably believes that such conduct is necessary to prevent or terminate such other's unlawful entry into or attack upon a dwelling. However, he is justified in the use of force which is intended or likely to cause death or great bodily harm only if:

(1) The entry is made or attempted in a violent, riotous, or tumultuous manner, and he reasonably believes that such force is necessary to prevent an assault upon, or offer of personal violence to, him or another then in the dwelling, or

(2) He reasonably believes that such force is necessary to prevent the commission of a felony in the dwelling." 720 ILCS 5/7-2(a) (West 2018).

¶ 29    A home dweller is not required to wait for unlawful entry to be accomplished before using justifiable force against the invader. *People v. Stombaugh*, 52 Ill. 2d 130, 136 (1972). Moreover, unlike self-defense, defense of a dwelling "does not require danger to life or great bodily harm in order to invoke the right to kill." *Eatman*, 405 Ill. at 497. The use of deadly force in defense of a dwelling is justified when the victim's entry is made in a "violent, riotous, or tumultuous manner" and the defendant subjectively and reasonably believes that deadly force "is necessary *to prevent an assault upon, or offer of personal violence to, him or another then in the dwelling*." (Emphasis added.) 720 ILCS 5/7-2(a)(1) (West 2018); *People v. Sawyer*, 115 Ill. 2d 184, 192 (1986). The issue is whether the facts and circumstances induced a reasonable belief that the threatened danger, whether real or apparent, existed. *Sawyer*, 115 Ill. 2d at 192. "[T]he party assailed is not expected to have perfect judgment." *People v. Shipp*, 52 Ill. App. 3d 470, 477 (1977).

¶ 30    The reasonableness of a defendant's subjective belief that he was justified in using deadly force is a question of fact for the fact finder. *Sawyer*, 115 Ill. 2d at 193; *People v. Evans*, 87 Ill.

10

2d 77, 86 (1981). We will not disturb a finding on this issue "unless the evidence is palpably contrary to the verdict or so unreasonable, improbable, or unsatisfactory that it justifies entertaining a reasonable doubt of the defendant's guilt." (Internal quotation marks omitted.) *Sawyer*, 115 Ill. 2d at 193-94; *Evans*, 87 Ill. 2d at 86. If there is "grave doubt as to the defendant's guilt," it is the duty of the reviewing court to reverse the judgment. *Shipp*, 52 Ill. App. 3d at 477.

¶ 31        Under the facts and circumstances presented in this case, there is grave doubt as to Yanez's guilt. Even taking the evidence in the light most favorable to the State, as we must, no rational trier of fact could have found beyond a reasonable doubt that Yanez did not act reasonably in defense of himself and Julian. It is undisputed that Ortiz attempted to enter Yanez's home in a violent, riotous, or tumultuous manner. Accordingly, the only question is whether Yanez's belief that deadly force was necessary to prevent an assault upon Yanez or Julian within the home was reasonable. As the trial court correctly found, (1) Yanez was not the aggressor in the incident; (2) Yanez was not required to call the police; (3) Ortiz reached into Yanez's home after breaking the window of the door to the home, (4) Ortiz said "I'm going to fuck your ass up" in his attempt to gain entry into the home; and (5) Julian, who was present in the home at the time, was scared during this exchange. These facts, standing alone, establish that Yanez reasonably believed that deadly force was necessary to prevent Ortiz from entering the home and assaulting Yanez and Julian.

¶ 32        Additional facts not referenced by the trial court further support this conclusion. It is undisputed that Ortiz was substantially larger than Yanez. Yanez is five feet, seven inches tall, whereas Ortiz was over six feet tall and weighed 280 pounds. It is also undisputed that Ortiz was intoxicated at the time. Moreover, Ortiz's pounding on the door happened on three occasions, each one more aggressive than the last. During Ortiz's assault on the home, Julian was frightened

11

enough to crawl away from the door on his hands and knees, and he was so scared that he was unable to call the police. Julian thought that Ortiz was going to harm him and his uncle if Ortiz gained entry into the house.

¶ 33 Yanez justifiably became increasingly alarmed as Ortiz's actions escalated and became more aggressive. After the first round of Ortiz's banging on the door, Yanez exercised restraint and remained calm. It was only after Ortiz began banging more loudly and told Yanez "[i]'m going to fuck you up" that Yanez grabbed a knife. According to Julian, Yanez appeared to be startled and "very worried" at that point. Yanez told Julian that Julian would have to help him if Ortiz got Yanez on the ground, and he suggested that Julian might want to have a weapon handy. He also told Julian to call the police, but Julian was too nervous to do so. After this, Ortiz became even more aggressive. He broke the glass window in the front door in an attempt to open the door while demanding to know whether Yanez had hit Ortiz's sister. Under these circumstances, Yanez had a reasonable belief that deadly force was necessary to prevent Ortiz from entering the home and assaulting Yanez and Julian.

¶ 34 In concluding otherwise, the trial court found that Yanez "had all kinds of time" before stabbing Ortiz, that Yanez was "not scared" because he kept reassuring Julian that nothing was going to happen and things would calm down, that Yanez was "lying in wait" for Ortiz, and that Ortiz had committed criminal damage to property but nothing to justify Yanez's actions. The trial court compared the situation to "bullies in school" threatening an assault and suggested that Ortiz had more time to address the situation than would the victim of a schoolyard bully.

¶ 35 These findings are contradicted by the record. It is difficult to see how Yanez had "all kinds of time" when an intoxicated, enraged, large man who had just threatened to assault Yanez had broken the glass door to Yanez's home and reached in the window in an attempt to enter the

12

home. Moreover, all of the evidence, including Julian's testimony about Yanez's appearance, actions, and statements after the second round of aggressive knocking, indicates that Yanez was "startled" and "very worried" at that time. It stands to reason that Yanez would have become even more alarmed, and justifiably so, after Ortiz had broken the glass and his forcible entry into the home appeared to be imminent. A home dweller is not required to wait for an unlawful entry or a physical assault to be accomplished before using justifiable force against the intruder. *Stombaugh*, 52 Ill. 2d at 136; 720 ILCS 5/7-2(a)(1) (West 2018).

¶ 36　　Further, contrary to the trial court's assertion, Yanez did not keep reassuring Julian during Ortiz's assault on the home that nothing was going to happen and that things would calm down. Yanez made those statements only once, after the first round of knocking. In addition, the trial court's comparison of Yanez's conduct to that of a person reacting to threats from a schoolyard bully is inappropriate because the instant case involved a threat to individuals inside a dwelling, not a threat occurring outside the home. Cases involving threats to persons inside a dwelling are governed by different standards, and it is far easier to establish a defense in such cases.

¶ 37　　Finally, it is difficult to imagine how the trial court could have concluded that Yanez was "lying in wait" for Ortiz. Yanez was cornered inside his own home with his 14-year-old nephew while Ortiz threatened violence while committing a forcible entry into the home. The conclusion that Yanez was "lying in wait" defies both common sense and the trial court's finding that Yanez was not the aggressor in the incident.

¶ 38　　In arguing that Yanez's actions were unreasonable, the State relies upon *Sawyer*, but that case is distinguishable. In *Sawyer*, (1) the defendant and the victim stood outside and talked calmly for several minutes before they began to scuffle inside the house, (2) the defendant's girlfriend could not tell whether the scuffle was started by the victim or by the defendant, (3) the

13

defendant's girlfriend disputed the defendant's claim that the victim attempted to assault her when he entered the house, and (4) the defendant and the victim were "approximately the same age and physical size." *Sawyer*, 115 Ill. 2d at 192-96. Here, by contrast, Ortiz was the aggressor (as the trial court found), Ortiz acted extremely aggressively and attempted to break into the house while verbally threating to assault Yanez, and Ortiz was substantially larger than Yanez. Thus, *Sawyer* is inapposite.

¶ 39    After considering all of the evidence in the light most favorable to the State, including the witness testimony and the video of the incident taken by Yanez's home surveillance system, we conclude that no rational trier of fact could have found beyond a reasonable doubt that Yanez's use of force was not justified under section 7-2(a) of the Code.

¶ 40    Yanez asks us to remand the case for a new trial. However, because we have held that the evidence presented at trial was legally insufficient to convict Yanez, double jeopardy precludes the State from retrying Yanez. See *People v. King*, 2020 IL 123926, ¶ 52; *People v. Drake*, 2019 IL 123734, ¶ 20; *People v. Lopez*, 229 Ill. 2d 322, 366-67 (2008). Accordingly, we vacate Yanez's conviction outright. We need not address Yanez's remaining arguments.

¶ 41                                          CONCLUSION

¶ 42    For the foregoing reasons, we vacate Yanez's conviction for second degree murder.

¶ 43    Conviction vacated.