NOTICE

Decision filed 11/27/23. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2023 IL App (5th) 220124-U

NO. 5-22-0124

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE

This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Jefferson County. |
| | ) | |
| v. | ) | No. 20-CF-221 |
| | ) | |
| ALVIN SMALLWOOD, | ) | Honorable |
| | ) | Jerry E. Crisel, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

PRESIDING JUSTICE BOIE delivered the judgment of the court.
Justices Cates and McHaney concurred in the judgment.

**ORDER**

¶ 1     *Held*:   Trial counsel's failure to assert the defense of dwelling and failure to ensure that the jury was properly instructed was deficient and prejudicial, and thus amounted to ineffective assistance of counsel.

¶ 2     The defendant, Alvin Smallwood, was indicted with two counts, counts I and II, of aggravated battery with a firearm, in violation of section 12-3.05(e)(1) of the Criminal Code of 2012 (Code) (720 ILCS 5/12-3.05(e)(1) (West 2020)); two counts, counts III and IV, of armed violence predicated on reckless conduct that caused bodily harm in violation of sections 12-5(a)(2) and 33A-2(c) of the Code (*id.* §§ 12-5(a)(2), 33A-2(c)); and one count, count V, of unlawful possession of a weapon by a felon in violation of section 24-1.1(a) of the Code (*id.* § 24-1.1(a)). The defendant was acquitted of counts I and II after a jury trial. The defendant was convicted of the remaining counts, and the jury also found that the defendant discharged a firearm that caused

1

great bodily harm to both victims. The trial court sentenced the defendant to a combined 60 years' incarceration to the Illinois Department of Corrections (IDOC).

¶ 3                                    I. BACKGROUND

¶ 4      The defendant's charges arose out of an incident that took place on July 29, 2020, at his home in Mt. Vernon, Illinois. That day, the defendant shot Keshawn Harris and Isaiah Green after a group of people came to the defendant's residence. The defendant testified that the group was yelling for him to come outside, knocking on the doors, jiggling the door handles, and attempting to pull up the garage door. After approximately 30 minutes of the group being outside of his home, the defendant fired gunshots through his garage door when he saw fingers appear under the garage door in an attempt to lift the door. Green and Harris were struck by bullets and injured.

¶ 5      The events leading up to the shooting were as follows. On July 29, 2021, the defendant was staying with his girlfriend, Dicci Ladd, who had just returned home from the hospital after suffering from a stroke. The defendant was drinking alcohol. In the afternoon, Dicci's teenage niece, R'Jhyae Foulks, and Dicci's grandson, eight-year-old Antoine Moore, came to Dicci's house to drop off food. R'Jhyae's friend, 15-year-old Jhyrawn Harris, was in the passenger seat. The teens waited outside while Antoine delivered the food to Dicci.

¶ 6      While Antoine was inside, the defendant, who had been smoking on the front porch, approached R'Jhyae and Jhyrawn in the car. The defendant complained to them that they had forgotten to bring drinks, eventually repeating himself to the point that R'Jhyae tried to raise up the window where the defendant was speaking to Jhyrawn. The defendant reacted based on his perception that Jhyrawn raising up the window was a sign of disrespect. The defendant stuck his hand in the window to stop it from closing. The defendant then poked Jhyrawn's chest and pushed Jhyrawn's head back a few times, while calling Jhyrawn names. R'Jhyae called for Dicci's help,

2

who came out to the car and pushed the defendant out of the way. Antoine jumped into the car and left with R'Jhyae and Jhyrawn.

¶ 7    After the incident, Dicci told the defendant that he had "messed up" by putting his hands on another person's child and she asked him to leave, which he did. In the meantime, Jhyrawn called his mother, Keshawn Harris, crying about what had just happened. R'Jhyae dropped Jhyrawn off at home and briefly spoke to Jhyrawn's uncle about what had just happened. R'Jhyae then went to buy drinks, delivered them to Dicci, and went inside to spend time with her. During this time, another niece of Dicci's, Mahzaria Ladd, pulled up with Ricardae Foulks and Ashuntae Martin. They all went into Dicci's house and talked, trying to help to calm Dicci down, as she was very upset. The defendant returned to Dicci's house while they were there, and he showed her that he had a gun. Dicci said, "Baby, they gonna kill you." Dicci again asked the defendant to return home and go to sleep, and he went home. Dicci testified that when she said "they gonna kill you," she meant that the police would kill the defendant if they saw him with a gun.

¶ 8    R'Jhyae, Mahzaria, Ricardae, and Ashuntae left Dicci's house. As they pulled away, Keshawn Harris and another car pulled up with people who were looking for the defendant. Everyone except Dicci, including Dicci's teenage son, Isaiah Green, then proceeded to the defendant's house.

¶ 9    According to Isaiah Green, he went with his cousins to the defendant's house because "they was into it with him." When he arrived at the house "a lot of people [were] out there just arguing and screaming." He testified that the screaming was directed at the garage door. Keshawn Harris testified that she went to talk to the defendant because she wanted to see what the problem was between him and her son. Keshawn testified that she saw Mahzaria Ladd go around the house attempting to open a carport door and then beating on the garage door and trying to lift it up. Mahzaria yelled at the defendant to "bring your ass out." R'Jhyae Foulks also witnessed Mahzaria

3

trying to lift up the garage door but denied that people were screaming. R'Jhyae estimated that about nine people had been standing around the defendant's house for about 30 minutes when the defendant shot through his garage door and "everyone just ran."

¶ 10    The shots fired through the garage door hit Keshawn Harris in the knee and Isaiah Green on his left side. Harris's knee was permanently injured, requiring surgical intervention. Isaiah Green's spleen sustained a laceration, and the bullet that struck him remained between his ribs adjacent to his kidney. Isaiah was discharged without surgery after seven days of observation.

¶ 11    When Captain Carr with the Mt. Vernon Police Department arrived on the scene after the shooting, he saw that Mahzaria Ladd was agitated and angry at the defendant. Captain Carr asked the defendant if he knew why Mahzaria was so mad at him, and he replied that he did not know and that he did not know who she was. Captain Carr could smell alcohol coming from the defendant's breath and noted that he was lethargic in his mannerisms. Captain Carr saw multiple bullet holes in the garage door on the back of the defendant's home. When Captain Carr asked the defendant if he had heard anything, the defendant replied that he heard people outside pounding on the back and on the side of the house, but that when he came outside, he did not see anybody. During a search of the house, the police found 11 bullet holes in the garage door that went from the inside to the outside of the garage. There were shell casings on the garage floor and a small black handgun was found in the bedroom sitting on the bed. The defendant was arrested.

¶ 12    Prior to trial, the defendant filed answers to a motion for pretrial discovery by the State, on April 14 and April 16, 2021. In those answers to discovery, the defendant indicated that he was "relying upon a defense of justifiable use of force to defend himself." At a pretrial hearing on April 20, 2021, defense counsel informed the trial court that the defendant would be proceeding to trial under an affirmative defense of self-defense. The defendant did not mention the affirmative

4

defense of defense of dwelling in any pretrial filing or during any of the proceedings before the trial court.

¶ 13     A jury trial was held on April 27, 2021, through April 30, 2021. During opening statements, defense counsel stated: "I think you're going to find that [the defendant's] actions were reasonable, and that he was justified in the use of force to protect himself *and his property*." (Emphasis added.) The jury acquitted the defendant of both counts I and II, the aggravated battery counts. The jury found the defendant guilty of counts III and IV, for armed violence, and count V, unlawful possession of a weapon by a felon. The jury also found that the defendant discharged a firearm that caused great bodily harm to both Isaiah Green and Keshawn Harris. The trial court sentenced the defendant to an aggregate sentence of 60 years in the IDOC.

¶ 14     At trial, the State presented evidence that while the defendant was in pretrial custody, he exchanged messages with Dicci. He told Dicci that he "had a drinking problem and a temper." He described the incident and told her that when he was inside of his garage, he heard someone say: "bring your goofy ass outside," and "you can run but you can't hide." He also wrote that "none of these bullets had names on them," and that he believed that the people outside of his house wanted to kill him.

¶ 15     After the State rested, defense counsel made an oral motion for a directed verdict, arguing that the defendant was justified when he fired shots into his garage door. According to defense counsel, the defendant acted in justifiable self-defense because he reasonably feared for his own life after Dicci told him that people were coming to kill him. Defense counsel argued that the defendant was not aiming at anyone but was shooting to get the crowd gathered outside of his house to leave. The State responded that, even if the defendant feared for his life, it was unreasonable to shoot through a door that he could not see through in self-defense. The trial court

denied the motion, reasoning that it did not "think there's much shown as to justifiable use of force in this case."

¶ 16 The defense called two employees from a store located across the alley from the defendant's house to testify. Both employees noticed the commotion at the house, heard hollering, loud music, and gunshots, and saw people scattering. Additionally, the defendant's mother, Brenda Johnson, testified that Dicci called her several times before the shooting happened. With every call, Dicci sounded more concerned until she sounded "frantic." Dicci warned Brenda that a car full of people were looking for the defendant and knew where he lived. Brenda testified that after receiving Dicci's warnings, she was "so nervous and upset, and [she] left *** because she didn't know what was going to happen if a group of people were on their way to [her] house."

¶ 17 The defendant testified in his own defense. The defendant's testimony regarding his altercation with Jhyrawn substantially mirrored the State's witnesses' versions of those events. The defendant then explained that after the altercation with Jhyrawn, and before people arrived at his home, he received a call from Dicci's sister, Madlon Ladd. Madlon told the defendant that he had "messed up" when he put his hands on Jhyrawn, and warned the defendant that people were coming to his house to "get him" for what he did. After the call, the defendant went back to Dicci's home where Dicci told him that people would kill him.

¶ 18 The defendant recounted that he returned home and went into his garage to smoke a cigarette and do laundry. He was inside his house when he heard people arrive. He heard someone try to get into one of the doors by jiggling the doorknob and heard demands that he "bring [his] goofy ass outside," and threatening "you can run, but you can't hide." The defendant was hiding in the garage with the lights off when he heard pounding against the garage door and saw that someone had put their fingers under the door and was trying to lift it. It was dark in the garage, except for a little light entering where the garage door did not fully close. The defendant testified

6

that he was scared, and believing that his life was in danger, the defendant took his gun and started shooting into the garage door, believing that he could not otherwise defend himself and "needed people to get away from his house." The defendant did not aim at anyone because he could not see anyone. Because he was so scared, he simply fired until the gun was empty. He did not realize when he fired that it was Dicci's family that was at his house.

¶ 19    On cross-examination, the defendant explained that he was scared because he believed that people were trying to break into his house. People were threatening him from outside of all the doors: side, front, and garage. While he did not think that people could kick down a house door, he did think that someone could open up the garage door, and he believed that the people "all came to do something to me." The defendant fired at the garage door, hoping that the person who was lifting it up would let go of the door. The defense rested after the defendant's testimony.

¶ 20    At a jury instruction conference, there was no disagreement between the parties or the trial court about which instructions to use. Upon defense counsel's request, the trial court gave a jury instruction on the affirmative defense of self-defense. See Illinois Pattern Jury Instructions, Criminal, No. 24-25.06 (4th ed. 2000) (hereinafter IPI Criminal 4th). Defense counsel did not request, and the trial court did not give, a jury instruction regarding the affirmative defense of defense of dwelling. See IPI Criminal 4th No. 24-25.07.

¶ 21    In closing, the State argued that the evidence did not demonstrate that the defendant was in fear of imminent death or great bodily harm to himself, as would be required for his claim of self-defense. See 720 ILCS 5/7-1 (West 2020). According to the State, the defendant was simply "overreacting." The State hypothesized that if the people outside had wanted to break into the defendant's home, they could have because there were so many of them. The State also stated that the defendant could have called the police, but chose not to, and that he remained in his garage rather than "securing himself in his own residence." The State further argued that the defendant

7

could have retreated into his home and simply "gone to bed" when the people were outside of his home, yet he chose to shoot into the garage door.

¶ 22    Defense counsel argued in closing that the defendant acted in reasonable self-defense. Defense counsel told the jury that the people who came to the defendant's home were there to scare him, intimidate him, and "possibly lynch him." Defense counsel told the jury:

> "The question I asked was, is it reasonable—does Keshawn have a greater right to go out to his house and scare him, disrespect him, perhaps beat him up? Is that right greater than what [the defendant's] right is to defend himself and to defend his house? That's the question."

¶ 23    In explaining self-defense law, defense counsel told the jury that:

"a person is justified in the use of force, which is intended or likely to cause death or great bodily harm—obviously shooting through a door is that \*\*\* if he reasonably believes that such force is necessary to prevent imminent death or great bodily harm to himself. That's the question that you need to decide for yourself, and I think it seems rather obvious."

Counsel did not otherwise address defense of dwelling as a justification for the defendant's use of deadly force.

¶ 24    In rebuttal, the State argued that it was the defendant who was looking for a conflict that day. Once people showed up at his home, the defendant "could have just gone to sleep, done nothing," or called the police and told them that he did not "want to talk to these people." Additionally, according to the State, the defendant failed to warn the people who were trespassing by telling them to "get off his property," and he could have "fired a warning shot."

¶ 25    During deliberations, the jury sent out a note stating: "We have a question about the law as it relates to the right to defend property. What does the law say about one's right to defend one's

property?" The trial court suggested responding: "You have all the law you are to consider in this case." The State and defense counsel agreed, and that response was provided to the jury.

¶ 26 The jury returned a verdict of not guilty on the aggravated battery charges. The jury found the defendant guilty of both armed violence counts and the unlawful possession of a weapon by a felon count. The jury also found that the defendant discharged a firearm that caused great bodily harm to both Isaiah Green and Keshawn Harris.

¶ 27 The defendant filed a motion for a new trial on June 1, 2021, arguing that the defendant's armed violence conviction should be set aside as it violated the Illinois Supreme Court's prohibition on double enhancements, as set out in *People v. Haron*, 85 Ill. 2d 261 (1981). The defendant argued that the State was using the element of great bodily harm twice: first to elevate the underlying offense—reckless conduct—from a misdemeanor to a felony, and then to prove the great bodily harm element for armed violence under section 33A-2(c) of the Code. The defendant also argued that the conviction violated the proportionate penalties clause of the Illinois Constitution because the reckless conduct that the defendant was convicted of would be punished more harshly than if he had been convicted of intentionally committing aggravated battery with a firearm. The trial court denied the motion for a new trial in a written order entered on July 12, 2021.

¶ 28 At sentencing, the defendant was sentenced to 30 years' imprisonment for armed violence for the shooting of Keshawn Harris, 25 years' imprisonment for armed violence for the shooting of Isaiah Green, and 5 years' imprisonment for unlawful possession of a weapon by a felon, all sentences to run consecutively, for an aggregate sentence of 60 years' imprisonment. Additionally, the trial court ordered the defendant to pay $21,088 in restitution for Keshawn Harris's medical expenses.

9

¶ 29    The defendant filed a motion to reconsider the sentence, reiterating the challenge to the sentence under the Illinois proportionate penalties clause, which the trial court denied. A timely notice of appeal was filed on March 3, 2022. This appeal followed.

¶ 30                                II. ANALYSIS

¶ 31    The defendant raises five issues on appeal. First, the defendant argues that the trial court erred in failing to give a jury instruction for the affirmative defense of defense of dwelling, after the jury sent a note asking for clarification on the law relating to defense of property. Second, the defendant argues that defense counsel provided ineffective assistance of counsel, where defense counsel failed to raise the affirmative defense of defense of dwelling, did not argue it to the jury, and did not request that the jury be instructed on it. Third, the defendant argues that his armed violence charges resulted in an improper double enhancement. Fourth, the defendant argues that the acts on which his armed violence convictions were based constituted a single unit of prosecution. Fifth, and finally, the defendant argues that his sentence for armed violence violated the proportionate penalties clause of the Illinois Constitution.

¶ 32    We will begin our analysis with the defendant's second issue regarding ineffective assistance of counsel. The defendant argues that he received ineffective assistance of counsel where his trial counsel argued self-defense as an affirmative defense, but failed to raise, fully argue, or offer a jury instruction, on the affirmative defense of defense of dwelling. The defendant further argues that defense counsel and the trial court failed to offer a jury instruction on defense of dwelling, even where the jury, during deliberations, asked the question related to the right to defend property. As such, the defendant argues that such failures constituted ineffective assistance of counsel, where there was sufficient evidence at trial to raise the affirmative defense of justifiable use of force in defense of a dwelling, especially where, as here, the defense theory of the case was self-defense.

10

¶ 33 The State responds only to the issue of defense counsel's failure to request, and the trial court's failure to give, the jury instruction on the affirmative defense of defense of dwelling in response to the note sent out by the jury during deliberations. The State argues that the evidence at trial failed to produce any indication that anyone attempted to enter the defendant's dwelling in a riotous, tumultuous, or violent manner. Further, the State argues that no evidence supported a finding that the defendant had a reasonable belief that force was necessary to prevent an assault or other felony within his dwelling. We will address only the defendant's claim that defense counsel's failure to present the affirmative defense of defense of dwelling rose to the level of ineffective assistance of counsel, as we find it to be dispositive.

¶ 34 The right to counsel guaranteed by both the United States and Illinois Constitutions includes the right to the effective assistance of counsel. U.S. Const., amends. VI, XIV; Ill. Const. 1970, art. I, § 8; *Strickland v. Washington*, 466 U.S. 668 (1984). To succeed on a claim of ineffective assistance of counsel, a defendant must show both that counsel's representation was deficient, and that such deficiency prejudiced the defense. *Strickland*, 466 U.S. at 685-86. Trial counsel's performance is deficient where it falls outside of the range of reasonable, professionally competent assistance, and prejudice exists where the deficient representation denies the client a fair trial. *Id*. at 687-90. The defendant's failure to satisfy either the deficiency prong or the prejudice prong of the *Strickland* test precludes a finding of ineffective assistance of counsel. *Id*. at 697.

¶ 35 When conducting a *Strickland* analysis, the defendant must overcome the strong presumption that the challenged action or inaction of counsel was the product of sound trial strategy and not of incompetence. *People v. Barrow*, 133 Ill. 2d 226, 247 (1989). Counsel is ineffective, however, when he fails to present a legal defense available for his client. *People v. Goods*, 2016 IL App (1st) 140511, ¶¶ 54, 56-57. Further, it is well settled in Illinois that counsel's

11

choice of jury instructions is a matter of trial strategy, generally immune from ineffective assistance claims. *People v. Douglas*, 362 Ill. App. 3d 65, 75 (2005). Accordingly, counsel's decision as to which jury instruction to tender can support a claim of ineffective assistance of counsel only if that choice is objectively unreasonable. *Id.* "Where defense counsel argues a theory of defense but then fails to offer an instruction on that theory of defense, the failure cannot be called trial strategy and is evidence of ineffective assistance of counsel." *People v. Serrano*, 286 Ill. App. 3d 485, 492 (1997). Where, as here, the claim of ineffective assistance of counsel was not raised in the trial court, our review is *de novo. People v. Lofton*, 2015 IL App (2d) 130135, ¶ 24.

¶ 36    Turning to the first prong of *Strickland*, we do not find that under the circumstances, the challenged inaction of counsel was a valid trial strategy. The initial question before us is whether a defense of dwelling theory was justified in this case. The defendant is entitled to instructions on those defenses which the evidence supports. *People v. Everette*, 141 Ill. 2d 147, 156 (1990). The threshold of evidence required to raise an affirmative defense is low. *People v. Kite*, 153 Ill. 2d 40, 45 (1992). Generally, the defendant bears the burden to present evidence in support of their theory of the case, and where the defendant does not present supporting evidence, a proffered instruction should be refused. *Id.* Where the evidence presented by the State raises the issue of the affirmative defense, however, the defendant will be excused from presenting any evidence thereon. *People v. Jones*, 175 Ill. 2d 126, 132 (1997).

¶ 37    In discussing defense of dwelling, this court has acknowledged that "a man's habitation is one place where he may rest secure in the knowledge that he will not be disturbed by persons, coming within, without proper invitation or warrant, and that he may use all of the force apparently necessary to repel any invasion of his home." *People v. Eatman*, 405 Ill. 491, 498 (1950). To justify a defense of dwelling theory, section 7-2(a) of the Code provides, in relevant part:

12

"(a) A person is justified in the use of force against another when and to the extent that he reasonably believes that such conduct is necessary to prevent or terminate such other's unlawful entry into or attack upon a dwelling. However, he is justified in the use of force which is intended or likely to cause death or great bodily harm only if:

(1) The entry is made or attempted in a violent, riotous, or tumultuous manner, and he reasonably believes that such force is necessary to prevent an assault upon, or offer of personal violence to, him or another then in the dwelling, or

(2) He reasonably believes that such force is necessary to prevent the commission of a felony in the dwelling." 720 ILCS 5/7-2(a) (West 2020).

¶ 38    A home dweller is not required to wait for unlawful entry to be accomplished before using justifiable force against the invader. *People v. Stombaugh*, 52 Ill. 2d 130, 136 (1972). Moreover, unlike self-defense, defense of dwelling "does not require danger to life or great bodily harm in order to invoke the right to kill." *Eatman*, 405 Ill. at 497.

¶ 39    In the present case, the defense theory of the case was that the defendant was justified in the use of deadly force against those gathered outside of his home under the theory of self-defense. Self-defense, however, requires danger to life or great bodily harm in order to invoke the right to kill, unlike the defense of dwelling. *People v. Sawyer*, 115 Ill. 2d 184, 193 (1986). In applying a defense of dwelling, the issue is whether the facts and circumstances induced a reasonable belief that the threatened danger, whether real or apparent, existed. *People v. Yanez*, 2022 IL App (3d) 200007, ¶ 29. The reasonableness of a defendant's subjective belief that he was justified in using deadly force is a question of fact for the fact finder. *Sawyer*, 115 Ill. 2d at 193.

¶ 40    In order to instruct the jury on defense of dwelling, the defendant must establish some evidence as to use of force in the defense of a dwelling. The supreme court has distilled the

13

requirements of the defense of dwelling by use of force intended or likely to cause death or great bodily harm to include, first, that the entry or attempted entry must be made in a "violent, riotous, or tumultuous manner." 720 ILCS 5/7-2(a)(1) (West 2020); *Sawyer*, 115 Ill. 2d at 192. Second, the defendant's subjective belief that force is necessary to prevent an assault upon, or an offer of personal violence to, him or another in the dwelling must be reasonable. 720 ILCS 5/7-2(a)(1) (West 2020); *Sawyer*, 115 Ill. 2d at 192. All of the surrounding circumstances are relevant in assessing whether a defendant's beliefs regarding defense of a dwelling were reasonable. *Sawyer*, 115 Ill. 2d at 193.

¶ 41 In the present case, both the State's evidence and the defendant's evidence raised the issue of defense of dwelling. The State's witnesses testified that a group of between 8 to 10 individuals went to the defendant's house to confront him about an earlier altercation he had provoked with a minor. When the group arrived, those working in an office near the defendant's home testified that there was "hollering and yelling," a "commotion" that could be heard through the double doors of the office. The defendant testified that he heard pounding on his door and saw someone trying to turn the doorknob. The defendant saw several people outside when he peeked through a window and heard more knocking and people telling him to bring his "goofy ass" outside and stating: "you can run, but you can't hide." The defendant testified that he was scared that he would be hurt, or even killed, and retreated into the garage. Once in the garage, he heard continued commotion, banging on the garage door, and saw someone put their fingers underneath the bottom of the garage door in an attempt to lift it up. At that moment, the defendant fired his gun at the door. Keshawn and R'Jhyae also testified to the presence of a group of people outside of the defendant's house, yelling, and that Mahzaria attempted to turn a doorknob to the house and lift the garage door before the shooting. Before the group arrived at his home, Dicci and her sister Madlon had warned the defendant that the crowd was coming there to "get him," and, while he may have misunderstood

14

Dicci's intended meaning, he believed that he was warned that they may even kill him. The defendant's mother was so concerned after hearing from an increasingly agitated Dicci about the crowd looking for her son that she left their house in fear of what might happen when the group arrived.

¶ 42　This court cannot imagine a trial strategy where defense counsel, under this set of facts, would see fit to offer the affirmative defense of self-defense, to the exclusion of defense of dwelling, where there was some evidence as to the defendant's use of force in defense of his dwelling. This is especially so where the threshold for showing that the defendant's use of his gun was reasonable was much higher when asserting self-defense than defense of dwelling.

¶ 43　Under a self-defense theory, to justify his use of deadly force, the defendant had to demonstrate to the jury that he feared for his life or that he would suffer great bodily harm. Under the defense of dwelling, however, he need only to show that an attempted entry to his home was done in a "violent, riotous, or tumultuous manner," and the defendant subjectively and reasonably believed that deadly force was necessary to prevent an assault upon, or offer of personal violence to, himself within his home. *Yanez*, 2022 IL App (3d) 200007, ¶ 29. In his own house, the defendant was justified in using all of the force apparently necessary to repel an invasion of his home, and could even resist with force an unlawful entry by one whose purpose is to assault or do violence to him to the extent of taking the aggressor's life, even though the circumstances may not be such as to justify belief that there is actual peril of life or great bodily harm. *People v. Givens*, 26 Ill. 2d 371, 375 (1962). In the context of self-defense, it is the defendant's perception of the danger, and not the actual danger, which is dispositive. *Sawyer*, 115 Ill. 2d at 193.

¶ 44　Defense counsel was aware, at least to some extent, that the defense of dwelling may have justified his client's use of force in this case as defense counsel argued in his opening statement that the defendant sat in his house while a group of 8 to 10 people were "pounding on the door

15

screaming at him to come out." Defense counsel also indicated that the defendant was scared and very worried, and that he fired the gun at the door to try to get the people to leave because the defendant was in fear for his life. Finally, defense counsel argued that the defendant's actions were "reasonable, and that he was justified in the use of force to protect himself *and his property*." (Emphasis added.) In closing argument, defense counsel again argued that the defendant had a right to defend himself and to *defend his house*.

¶ 45     We have set forth the facts herein, as asserted by both the State and the defendant's witnesses. The defendant has shown that he established some evidence of each of the factors mentioned above relating to defense of dwelling. The jury, under proper instructions, might legitimately have found that the defendant was justified in his use of force under the theory of defense of dwelling. This is especially true where the jury itself questioned the trial court about the defendant's right under the law to defend his property. Thus, the defendant was entitled to have the affirmative defense asserted, and the jury instructed, on defense of dwelling.

¶ 46     While the reasonableness of the defendant's subjective belief that he was justified in using deadly force remains a question of fact for the jury to determine (*People v. Evans*, 87 Ill. 2d 77, 86 (1981)), the defendant need only present some evidence of an affirmative defense in order to raise the defense and justify an instruction. *People v. Pegram*, 124 Ill. 2d 166, 173 (1988). As we find that the defendant has met the threshold for applicability of defense of dwelling, defense counsel's failure to present the applicable defense was not reasonable trial strategy and fell below an objective standard of reasonableness, which amounted to deficient representation. Thus, the first prong of *Stickland* has been met.

¶ 47     Next, under *Strickland*, the defendant "must show that there is a reasonable probability that, but for defense counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "A reasonable probability is a probability sufficient to

16

undermine confidence in the outcome." *Id*. The defendant asserts that he was prejudiced by defense counsel's failure to raise and request that the jury be instructed on defense of dwelling. The defendant argued that the jury's question during deliberations asking about defense of property suggested that, had they been properly instructed, there was at least a reasonable probability that the outcome of the trial would have been different. We agree.

¶ 48    The defendant testified that he believed that there was a crowd outside of his home and that they were trying to gain entry into his home while banging on doors, jiggling handles, yelling, and making statements such as, "you can run but you can't hide," and to bring his "goofy ass" outside. Based on the events of that day, the defendant believed that the crowd was angry at him for his earlier actions when he started an altercation with a minor, and the defendant had been warned that the crowd wanted to do him harm.

¶ 49    As such, we find that the defendant was prejudiced when his attorney did not plead or fully argue the affirmative defense of defense of dwelling, where some evidence was presented as to all of the elements of the defense and failed to instruct the jury on the same. See *Serrano*, 286 Ill. App. 3d at 492 (concluding that where "defendant did not dispute that he was present during [an armed robbery] but contended that he was compelled through fear to do it," defense counsel was constitutionally ineffective for failing to request the compulsion instruction). The facts in this case at least minimally raised the affirmative defense of defense of dwelling, and had defense counsel raised the defense, there is a reasonable probability that the result of the proceeding would have been different. Therefore, we find that the second prong of *Strickland* has been met and that defense counsel was ineffective in failing to raise the affirmative defense of defense of dwelling on behalf of the defendant.

¶ 50    Based on the foregoing, we find that the defendant was denied the effective assistance of counsel; thus, his convictions for armed violence must be reversed and a new trial ordered. Due to

17

our determination regarding reversal of the defendant's armed violence convictions, we need not address the defendant's claims of double enhancement, course of conduct, or excessive sentence as to the same counts.

¶ 51 The defendant has not raised a challenge to the sufficiency of the evidence. We find that the evidence was sufficient to prove the defendant guilty beyond a reasonable doubt and, therefore, double jeopardy does not bar a retrial. See *People v. Junior*, 349 Ill. App. 3d 286, 293 (2004).

¶ 52                                III. CONCLUSION

¶ 53 Based on the foregoing, we reverse the defendant's convictions on counts III and IV, for armed violence, and remand for a new trial. The defendant's conviction and sentence for count V, unlawful possession of a weapon by a felon, is unchallenged upon appeal and, as such, is unaffected by the reversible error that occurred in this case. We therefore affirm the defendant's conviction and sentence for count V.

¶ 54 Affirmed in part and reversed in part.

¶ 55 Cause remanded.