2024 IL App (1st) 230461-U

Fourth Division
Filed February 8, 2024

No. 1-23-0461

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

**IN THE**
**APPELLATE COURT OF ILLINOIS**
**FIRST DISTRICT**

| | |
|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | Appeal from the |
|     Plaintiff-Appellee, | Circuit Court of Cook County |
| v. | No. 17 CR 01956 |
| CHARLES MILLER, | The Honorable Michael B. McHale, |
|     Defendant-Appellant. | Judge, presiding. |

JUSTICE OCASIO delivered the judgment of the court.
Justices Hoffman and Martin concurred in the judgment.

**ORDER**

¶ 1   *Held:*   The defendant's *pro se* postconviction petition was not frivolous or patently without merit based on *res judicata* where it alleged that appellate counsel was ineffective for not adequately challenging trial counsel's effectiveness.

¶ 2   In 2016, defendant Charles Miller shot and killed Angelo Davis on the street in front of multiple witnesses during an argument. He was convicted of first-degree murder in 2019 and is currently serving a 65-year sentence. After we affirmed his conviction on direct appeal (*People v. Miller*, 2021 IL App (1st) 191361-U), Miller filed a *pro se* postconviction petition alleging that he was denied the effective assistance of counsel at trial and on direct appeal. The circuit court summarily dismissed the petition. We reverse and remand for further proceedings.

¶ 3                                    BACKGROUND

¶ 4      At Miller's 2019 trial, the prosecution's evidence showed that, on the early evening of June 9, 2016, he and his friend Charles Williams drove in Williams's car to the 5300 block of South Princeton Avenue in Chicago so Williams could return some belongings to an ex-girlfriend, Nickita Appleton, who was staying at her aunt and uncle's house on that street. When they arrived, Williams got out to speak to Appleton while Miller stayed in the front passenger seat. The exchange did not go smoothly: Appleton had recently learned that she was pregnant by Williams, and the two of them got into a heated argument about the unborn child. Appleton's cousin Angelo Davis, who was talking to a friend of his across the street, crossed the street and asked them to calm down. From the car, Miller asked, "Who the f*** is this n***?" Appleton and Williams told him who Davis was and asked Miller to "[b]e cool." Davis went back across the street, but he came back when the argument between Appleton and Williams once again escalated. Using colorful language, Miller told Davis to stay out of it, but Davis waved him off with a hand and tried to calm the argument down again, at which point Miller began repeatedly calling him a "b*** a** n***" in a loud, aggressive tone.

¶ 5      Davis, who had been carrying a gym bag, dropped the bag to the ground and moved to approach Miller. In a reversal of roles, Appleton and Williams tried to keep the peace. Appleton used her arm to stop Davis from going further, and Williams closed Miller's door to keep him inside the vehicle. Davis laughed and went back to his gym bag. Miller, though, continued to taunt Davis by calling him a "b*** a*** n***." Davis responded, "I'll show you a b*** a*** n***," and started running toward the vehicle. Miller picked up a gun from inside the car and, from only two or three feet away, shot Davis in the face. At that point, Williams got into the car and drove away.

¶ 6      Appleton identified Miller as the shooter to the police, who located, detained, and questioned him about a week after the shooting. Miller gave an alibi and was allowed to leave. Investigators later determined that alibi was false, and Miller was arrested about seven months after the shooting.

¶ 7    Miller testified in his defense at trial. In his account, when he told Davis to let Appleton and Williams handle their own business, Davis responded, "I'm not talking to you, you b*** a*** n***." Miller retorted with the same insult. Davis walked off, put his gym bag on the ground, unzipped it, reached into it with his right hand, and then turned to face Miller, putting his right hand behind his leg so that Davis could not see what was in it. Davis told Miller, "I'm going to show you a b*** a*** n***," and ran at him and tried to open the vehicle door. Miller tried to keep the door shut with one hand while reaching for a gun that he had seen in the center console with the other. When Davis managed to get the door open about a foot, Miller swung the gun around and shot him because he thought Davis meant to do him "great bodily harm."

¶ 8    During Miller's direct examination, defense counsel attempted to elicit testimony that Miller had been shot during an incident in 2009.[1] Counsel asked Miller whether he had ever been the victim of a crime. He answered, "Yes," and the State objected. When the court sustained the objection, defense counsel said that the testimony would "go[] to his mental process," but the court disagreed. At that point, counsel asked to make an offer of proof. The court permitted counsel to make an offer of proof, and it had Miller, who was still on the witness stand, taken out of the courtroom. The following exchange ensued:

> "[DEFENSE COUNSEL]: Judge, the evidence I would be attempting to elicit would go to his state of mind.
>
> THE COURT: State on notice of any of this?
>
> [THE STATE]: No, Judge.
>
> THE COURT: This is the first time this is coming up, [counsel]?

---

[1]  Materials in the record, our decision on direct appeal in this case, and the parties' briefs state that the prior shooting occurred in 2011. According to the 2013 decision in the shooter's appeal of his conviction for attempting to murder Miller, though, the shooting occurred on December 5, 2009. *People v. Jones*, 2013 IL App (1st) 113462-U, ¶ 4. Based on the circuit court's electronic docket in that matter, 2011 reflects the date of the shooter's conviction for attempted murder. Case Summary, People of the State of Illinois v. Cristopher Jones, No. 10 CR 03495 01 (filed Feb. 25, 2010).

[DEFENSE COUNSEL]: I did not put them on notice, I didn't believe I had to put them on notice.

THE COURT: Okay. Let's hear it.

[DEFENSE COUNSEL]: Basically, 2011 [*sic*], he was a victim of multiple gunshots, and that, in my book, or he will be testifying, I believe that's what he will be testifying, that had an effect on his mental process.

THE COURT: In 2011 [*sic*], five years before this?

[DEFENSE COUNSEL]: He was victimized.

THE COURT: What are the other facts behind that, where, when, how, what happened.

[DEFENSE COUNSEL]: He was shot three times in the back, a couple of other places, he testified against the individual and the individual was subsequently convicted.

However, I'm not going to be trying to put anything in about the conviction, I just want to be able to have—elicit testimony that this had an effect upon his mental processes when put in this situation.

THE COURT: State?

[PROSECUTOR]: Well, first of all, Judge—

THE COURT: Yeah, you know, let me just say before I get the State's full response. Why would you not give that to the State? And yes, they are entitled to that, because you're talking about a known shooting that ended up in court that could be verified or not and you've given them no notice.

Go ahead, [State].

> [THE STATE]: Judge, not only is the defense owed a fair trial here, but so is the State, so are the People. This is brand new to me, I have no idea the facts and circumstances under that case, I have no idea who the witnesses were, I have no idea—any verification of it.
>
> I'm caught by surprise at this, and how an incident that occurred five years ago where it doesn't even sound like it was the same situation where he was the shooter and got returned shot at, I don't even believe it's relevant to his state of mind, this is a different situation.
>
> THE COURT: For all those reasons, you're not allowed to go there."

Defense counsel asked no further questions about the prior shooting.

¶ 9 On cross-examination, Miller admitted that, rather than telling the police that he shot Davis in self-defense, he lied and said that he was not present at the time of the shooting. On redirect examination, he explained that he was afraid to tell the police the truth because he thought they would only be interested in getting a conviction.

¶ 10 At the close of trial, the court rejected Miller's self-defense theory, finding that Miller did not subjectively believe "that danger existed that required him to shoot the victim in the face" and that any such belief would have been objectively unreasonable. It therefore found him guilty of first-degree murder.

¶ 11 On direct appeal, Miller argued that he was denied a fair trial because he was not allowed to testify about the 2009 shooting. Specifically, he contended that (1) the defense had no obligation to disclose Miller's testimony about the incident before trial, (2) excluding that testimony as a sanction for any discovery violation was an abuse of discretion, and (3) defense counsel's failure to disclose the testimony amounted to ineffective assistance. We rejected all of those arguments. As relevant here, in rejecting his claims of trial error, we repeatedly noted that the offer of proof

by Miller's attorney had not established the relevance of the prior shooting to the charged incident. *Miller*, 2021 IL App (1st) 191361-U, ¶¶ 45, 49-53, 58, 63. Because prejudice had not been shown, we also declined to find that counsel was ineffective:

> "Here, defendant has provided no evidentiary support explaining how the previous shooting affected his state of mind. Defendant only provided the circuit court with a conclusory, self-serving statement that he had been shot previously and that it affected his state of mind regarding the incident involving Davis. Defendant provided no evidence of similarity or whether Davis was even involved in the previous incident. Defendant's briefs on appeal provide no additional information for this court to even consider why or how he was prejudiced when the circuit court precluded him from testifying about the previous shooting. Considering that defendant cannot establish prejudice, he therefore cannot satisfy the prejudice prong under *Strickland*, which precludes a finding of ineffective assistance of counsel." *Id.* ¶ 67.

After rejecting Miller's challenge to his sentence as excessive, we affirmed his conviction and sentence. *Id.* ¶¶ 77, 79.

¶ 12    On June 29, 2022, Miller filed a *pro se* postconviction petition claiming that he was denied the effective assistance of counsel at trial and on direct appeal. The *pro se* petition alleged that trial counsel was ineffective because he failed to (1) disclose to the State evidence of the 2009 shooting as required by Rule 431(c), (2) make a sufficiently detailed offer of proof regarding the 2009 shooting, and (3) argue that excluding Miller's testimony about the 2009 shooting amounted to a denial of his right to present a complete and adequate defense. It further alleged that counsel on direct appeal was ineffective for not raising these challenges to trial counsel's effectiveness and for not providing additional information about the 2009 shooting to the court on direct appeal. The

*pro se* petition also alleged that trial counsel was ineffective because he did not present legal argument supporting the motion for a directed verdict at trial.

¶ 13    Miller supported his petition with an unsworn statement describing the 2009 shooting. According to his declaration, while taking out the trash, he saw his neighbor Christopher Jones on their shared back porch. Jones was "staring at [Miller] due to someone breaking into [Jones's] apartment," and he ignored Miller's nod of greeting. When Miller returned to the building, Jones pointed a gun at him, came down the stairs toward him, hit him in the mouth with the gun, and started asking, "What you got?" At Jones's direction, Miller got on the ground and stayed there for "a few minutes." Jones told him to stand up and go up the stairs to Miller's apartment. Afraid that Jones was planning to kill him along with his mother and girlfriend (who both lived with Miller), Miller broke into a run when he reached the steps. Jones opened fire and shot him three to five times before Miller made it to the safety of his apartment, where he passed out. He woke up in the hospital, where he was put into a coma for a week. It was two or three months before he could walk again, and his injuries and subsequent infections and other issues required 47 surgeries. For more than a year, he lived with a "medical bag" connected to his abdomen to collect waste. As of 2022, he still experienced "terrible visions about the day [he] was shot" and "nightmares about being shot." Ever since then, he has been "nervous and cautious of people" and is "always thinking other[s] want to hurt" him.

¶ 14    The circuit court entered a written order on September 19, 2022, summarily dismissing the *pro se* postconviction as frivolous and patently without merit. It found that the claim that trial counsel was ineffective for failing to disclose the 2009 shooting during discovery had been raised on direct appeal and was therefore barred by *res judicata*, and it found that the remaining claims in the petition were waived because they could have been raised on direct appeal. It further found that, even if the claims were not barred, Miller had failed to attach evidence and documentation supporting his claims that trial counsel was ineffective and that all of his claims failed on the merits.

¶ 15    We granted Miller leave to file a late notice of appeal on March 15, 2023. See Ill. S. Ct. R 606(c) (eff. Mar. 12, 2021).

¶ 16                                      ANALYSIS

¶ 17    The Post-Conviction Hearing Act, 725 ILCS 5/122-1 *et seq.* (West 2022), allows criminal defendants to collaterally attack their convictions based on claimed violations of constitutional rights during the proceedings leading to their convictions. 725 ILCS 5/122-1(a) (West 2022). It provides a three-stage process to adjudicate postconviction claims. *People v. Boclair*, 202 Ill. 2d 89, 99 (2002). Miller's petition was dismissed at the first stage. At the first stage, the court conducts an initial evaluation of the petition within 90 days of its filing. 725 ILCS 5/122-2.1 (West 2022). At this stage, the courts acts "strictly in an administrative capacity by screening out those petitions which are without legal substance or are obviously without merit." *People v. Rivera*, 198 Ill. 2d 364, 373 (2001). If this initial review discloses that the whole petition is "frivolous" or "patently without merit," the court must enter a written order summarily dismissing it. 725 ILCS 5/122-2.1(a)(2) (West 2022). A petition is frivolous or patently without merit only when it has no arguable basis in law or in fact. *People v. Hodges*, 234 Ill. 2d 1, 11-12 (2009). If the petition contains even one claim that is neither frivolous nor patently without merit, then the entire petition is advanced for further proceedings. 725 ILCS 5/122-2.1(b) (West 2022); *Rivera*, 198 Ill. 2d at 374 (holding that partial summary dismissals are not permitted by the Post-Conviction Hearing Act). Our review is *de novo*. *Hodges*, 234 Ill. 2d at 9.

¶ 18    On appeal, Miller argues that his claim that trial counsel was ineffective for failing to make an adequate offer of proof about the 2009 shooting had an arguable basis in law and fact. See *Strickland v. Washington*, 466 U.S. 668, 686 (1984).The State's only response is that this claim is precluded by our decision on direct appeal under the doctrine of *res judicata*. In postconviction proceedings, *res judicata* and forfeiture "operate to bar the raising of claims that were or could have been adjudicated on direct appeal." *People v. Blair*, 215 Ill. 2d 427, 443 (2005). A claim that was "raised and decided on direct appeal" is considered *res judicata*. *Id.* A claim "that could have

been raised, but [was] not," is forfeited. *Id.* at 443-44. A claim that is barred by either *res judicata* or forfeiture is necessarily frivolous or patently without merit. *Id.* at 445; see also *People v. Johnson*, 2021 IL 125738, ¶ 48 ("An otherwise meritorious claim has no basis in law if *res judicata* or forfeiture bar the claim.").

¶ 19    Resolving the State's argument does not require us to decide whether Miller's claim would ordinarily be barred by *res judicata* or forfeiture. Assuming for the sake of analysis that it was, there is a well-established exception to those doctrines that applies when the procedural bar "stems from the incompetence of appellate counsel." *Blair*, 215 Ill. 2d at 450-51. Criminal defendants have a right to the effective assistance of counsel on direct appeal. *People v. Easley*, 192 Ill. 2d 307, 328 (2000). An allegation that appellate counsel was ineffective can avoid such procedural bars. *People v. Schlosser*, 2012 IL App (1st) 092523, ¶ 22 (citing *People v. Turner*, 187 Ill. 2d 406 412-14 (1999)). And here, Miller's *pro se* petition expressly alleges that appellate counsel was ineffective for not raising or adequately presenting his claims that trial counsel was ineffective. We therefore reverse the summary dismissal of Miller's *pro se* petition and remand for second-stage proceedings. See 725 ILCS 5/122-2.1(b) (West 2022).

¶ 20                                    CONCLUSION

¶ 21    The judgment of the circuit court is reversed, and the cause is remanded for further proceedings.

¶ 22    Reversed and remanded.