NOTICE
Decision filed 03/02/26. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2026 IL App (5th) 231148-U

NO. 5-23-1148

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Champaign County. |
| | ) | |
| v. | ) | No. 18-CF-1775 |
| | ) | |
| D'ANGELIS M. CHAMBERS, | ) | Honorable |
| | ) | Roger B. Webber, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE BOLLINGER delivered the judgment of the court.
Justices Vaughan and Hackett concurred in the judgment.

**ORDER**

¶ 1   *Held*: The circuit court's first-stage summary dismissal of defendant's postconviction petition as frivolous and patently without merit is affirmed where trial counsel and appellate counsel did not arguably provide ineffective assistance of counsel.

¶ 2   Following a jury trial, defendant was convicted of first degree murder and subsequently sentenced to 55 years' imprisonment. Both the conviction and the sentence were upheld upon direct appeal. Defendant subsequently filed a *pro se* postconviction petition, which was summarily dismissed. On appeal, defendant contends that this dismissal was erroneous, asserting that his constitutional rights to effective assistance of both trial and appellate counsel were violated. We disagree and therefore affirm the summary dismissal.

1

¶ 3                                    I. BACKGROUND

¶ 4      In December 2018, defendant D'Angelis M. Chambers was charged with four counts of

first degree murder pursuant to section 9-1(a)(1) and 9-1(a)(2) of the Criminal Code of 2012 (720

ILCS 5/9-1(a)(1), (a)(2) (West 2016)) and one count of unlawful possession of a weapon by a felon

pursuant to section 24-1.1(a) (*id.* § 24-1.1(a)). Following a jury trial, defendant was convicted of

first degree murder and sentenced to 55 years' incarceration. On direct appeal, he asserted that the

trial court erroneously barred him from presenting certain evidence regarding the victim's

propensity for violence, that the trial court erroneously admitted a witness's hearsay statement,

and that the prosecutor misstated the law during closing arguments regarding an initial aggressor's

duty to retreat. The Fourth District Appellate Court affirmed the conviction in *People v. Chambers*,

2022 IL App (4th) 200299-U. That prior opinion detailed the background and the facts and

evidence from defendant's trial. Therefore, we recite only the facts from the record on appeal

necessary to our disposition.

¶ 5      The jury trial revealed that two sisters, Demeisha and Denika, resided together in a second-

floor apartment within a three-story building on Vawter Street in Urbana, Illinois. At the time of

the incident, defendant and Demeisha were dating, and defendant was often present at the

apartment. The victim, Renese Riley, was the father of Denika's child. Riley also regularly visited

the apartment.

¶ 6      Denika testified that in the early morning hours of December 30, 2018, an argument ensued

amongst defendant and the two sisters. Denika packed her belongings to leave and contacted Riley

to pick her up. Riley arrived and remained outside beyond the building's security gate, shouting at

defendant to "come downstairs." Denika stated that Riley could not get through the gate and into

the building. She further indicated that she went downstairs and positioned herself inside the gate

2

to calm Riley. The gate could only be opened with a key or by pushing the gate from the inside; Riley did not possess a key. Denika testified that she opened the gate and put an arm around Riley, attempting to calm him. She noted that he would not calm down, leading her to close the gate, thus preventing Riley from entering the building. She indicated she had no intention of letting him in. While she was holding the gate, Demeisha and defendant came down from the apartment. Denika further testified that Demeisha and defendant attempted to open the gate while she was holding it closed, with Riley remaining on the other side, silent. Riley then removed his jacket and hoodie, challenging defendant to a physical altercation. She testified that defendant attempted to push past the gate three times, succeeding on the third attempt. Following this, defendant proceeded to Demeisha's vehicle, deposited an item in the trunk, and returned to Riley, resulting in a physical confrontation. The two individuals exchanged blows, and at one point, Riley knocked defendant to the ground. Defendant stood back up, extended his arm, and discharged a firearm towards Riley. Denika testified that Riley was not lunging towards defendant nor reaching into his pocket, and the two were positioned at a distance that allowed defendant to fully extend his arm. After the shooting, defendant and Demeisha drove away. Denika never observed Riley with a firearm.

¶ 7 On cross-examination, Denika testified regarding an incident that transpired between Riley and defendant during Christmas. However, she stated that neither Demeisha nor defendant were concerned about the incident. She further testified that both defendant and Demeisha were "irritated" when Demeisha informed defendant that Riley "supposedly sent three girls over there to fight him." Denika stated that defendant laughed upon hearing Demeisha's statement.

¶ 8 Hortencia Morales, the upstairs neighbor of the sisters, testified that at approximately 2:30 a.m. on December 30, 2018, she heard screaming and angry voices emanating from the vicinity of the security gate. She observed one man outside the gate and another, inside with a woman; the

3

two men were arguing. The man outside the gate was dressed in a green jacket (Riley). She heard a woman shout, "Stop, stop." She testified that she saw the other man (defendant) exit the gate, at which point the two men began to fight. Both men were shouting and appeared to be angry. Riley delivered the first punch, followed by a mutual exchange of punches. Morales heard defendant say "come on, come on" and saw him gesturing with his hands, which she understood to mean that he wished to continue the altercation. Riley punched defendant, and she observed defendant reach for a firearm from his right side and shoot Riley. She indicated that the two men were approximately six feet apart at the time of the shooting, and Riley was not advancing towards defendant. She further stated that at the moment of the shooting, there was nothing preventing defendant from walking towards the street or back towards the gate. Morales never saw Riley with a gun. After the incident, she contacted the police and observed defendant leave in a vehicle accompanied by another woman.

¶ 9    During cross-examination, Morales stated that a woman was attempting to prevent defendant from coming out of the gate. On redirect, she testified that upon defendant's exit from the building, both men appeared to want to fight. Defendant was the individual who approached Riley.

¶ 10    Another neighbor, Mareysha West, testified that she heard someone banging on the gate trying to gain entry, and she observed Riley shouting, "Come outside." Defendant went out of the gate, and the men engaged in a physical altercation. During the altercation, West saw a woman exit the gate, go to a vehicle, place an object in it, and then enter the driver's seat. West further testified that she observed the men "tussling around the yard." At some point, she observed defendant extend his arm, after which she heard a gunshot and saw Riley stumble to the ground. Defendant remained standing over Riley for a few seconds before entering the vehicle with the

4

woman and departing. West testified that Riley was not advancing toward defendant at the time he was shot and was "backing up."

¶ 11    Demeisha, defendant's girlfriend, testified that prior to the incident, she heard defendant and Denika arguing in Denika's room about not wanting Riley or his sister in the apartment. The police were called, arrived, and then left. Sometime later, she heard Riley shouting obscenities outside her apartment window. She indicated that defendant wanted to go outside; however, she did not wish him to do so. Subsequently, both defendant and Demeisha proceeded downstairs to the gate, where Denika was holding it shut. Denika was upset and did not want Riley and defendant to fight. Demeisha stated that defendant was calm until Riley proclaimed that "he would catch [defendant] in the streets." Defendant pushed past Denika and the gate, and Demeisha proceeded to the car while the two men engaged in a physical altercation. She was unaware of who initiated the first punch, but she ultimately heard a gunshot. Defendant then came to the car, and they left.

¶ 12    Demeisha testified that during the Christmas of 2018, Denika and Riley were arguing, and she overheard Riley stating that he intended to have the apartment shot up. She testified that defendant also overheard the conversation. However, on redirect examination, she clarified that she had never seen Riley in possession of a firearm.

¶ 13    Defendant testified on his own behalf. He met Demeisha in August 2018, and they started dating. He would occasionally spend the night at her apartment. He testified regarding an incident that took place around Christmas 2018, in which he heard Denika and Riley arguing in the apartment. During this dispute, defendant heard Riley state that he intended to have the "crib shot up." Defendant further testified that following this argument, Riley walked past him in the hallway with an aggressive demeanor, which appeared to suggest to defendant that Riley wanted to "bump" his shoulder.

5

¶ 14    Regarding the incident in question, defendant testified that prior to the shooting, Demeisha was upset about Riley's sister being present in the apartment, which eventually escalated into an argument with Denika, leading to the police being called. Defendant decided to go to his parents' house and began packing his belongings to leave. At some point, he heard Riley outside the apartment building calling his name and saying, "bring your bitch ass outside." Defendant further testified that he merely allowed Riley to shout, yell, and threaten him.

¶ 15    Defendant testified that he and Demeisha proceeded downstairs with the intent of getting in his car and leaving. Defendant indicated that he believed Riley wanted to fight; however, he stated that he did not wish to do so. He further testified that he stood near the gate to see what would happen, while Riley continued to shout, call him names, and say, "come out here" and "come through the gate." Defendant testified that he did not re-enter the building because he thought that Denika would permit Riley to enter, noting that there was only one door leading into and out of the apartment. Nonetheless, defendant acknowledged the existence of another exit in the apartment building, although he claimed that this exit was far from his vehicle, which was parked near Riley.

¶ 16    Defendant testified that Denika was standing at the gate holding it closed, despite it being shut, and was also grabbing Riley. Defendant decided to exit the gate when Riley remarked, "I'm gonna catch your bitch ass in the street." He interpreted this statement as Riley was "gonna catch me in the street." Defendant made the decision to go outside the gate. Additionally, defendant testified that Riley showed him a firearm and was taunting him with it. He stated that he "did what anybody would do" and pushed the gate, which made contact with Riley. When the gate struck Riley, he took a few steps back and dropped the gun. Defendant stated that he exited the gate and retrieved the gun. Demeisha ran to the car, and he and Riley engaged in a physical altercation, with

6

Riley throwing the first punch. Defendant explained that he did not simply run and drive away because "the gun still would have been there and he could have grabbed the gun and fired at me as I was getting in the car."

¶ 17 Defendant testified that he picked up the firearm and an altercation ensued. He indicated that he began to lose the fight and became frightened. He explained that he was concerned that if Riley knocked him out, Riley would retrieve the gun and either shoot him or Demeisha. He stated that he shot Riley in an attempt to prevent Riley from knocking him out and reclaiming the firearm. Defendant further testified that he did not observe any other weapon on Riley. He stated that Riley was advancing towards him when he fired the shot. After he shot Riley, he approached him and "threw the gun down" because he did not want to take it with him. Defendant testified that he entered his vehicle and left the scene.

¶ 18 During cross-examination defendant testified that he had previously seen the firearm because it belonged to Denika, and he had observed it with her. He stated that neither the ammunition in the firearm nor the gun located in Demeisha's bedroom were his. Additionally, he indicated that the magazine and ammunition found at his parents' residence were not his.

¶ 19 The jury was provided with jury instructions, including those for self-defense. The jury convicted defendant of first degree murder and unlawful possession of a weapon by a felon. Defendant submitted a letter which prompted a hearing pursuant to *People v. Krankel*, 102 Ill. 2d 181 (1984). Following the trial court's inquiry, the trial court denied defendant's requests for new counsel. It also denied defendant's request for a new trial but granted defendant's motion to vacate his conviction of unlawful possession of a weapon by a felon, citing a defective charging instrument. Subsequently, defendant was sentenced to a term of 55 years' imprisonment for first

7

degree murder. On direct appeal, the conviction and sentence were upheld. *Chambers*, 2022 IL App (4th) 200299-U.

¶ 20    On March 14, 2023, defendant filed a *pro se* petition for postconviction relief pursuant to the Post-Conviction Hearing Act (725 ILCS 5/122-1 (West 2022)), asserting that the State violated his first amendment right to free speech by arguing that he was not entitled to the privilege of self-defense. Additionally, he argued that he was denied effective assistance of trial counsel 27 different ways and that he was deprived of effective assistance of appellate counsel for failing to raise the issues of ineffective assistance of counsel during the direct appeal. Defendant also claimed violations of his right to due process in eight different ways, his right to a speedy trial, and his right to a jury of his peers. Furthermore, he contended that the accumulation of errors deprived him of a fair trial. On June 9, 2023, the trial court issued a comprehensive 31-page order, summarily dismissing defendant's petition. Defendant subsequently filed this appeal.

¶ 21                                     II. ANALYSIS

¶ 22    Postconviction proceedings under the Post-Conviction Hearing Act (725 ILCS 5/122-1 *et seq.* (West 2022)) proceed in three stages. *People v. Hodges*, 234 Ill. 2d 1, 10-11 (2009). In the first stage, the court examines the defendant's *pro se* petition and, taking the allegations within the petition and any attached affidavits as true unless "positively rebutted" by the record, including transcripts, determines whether or not the petition is "frivolous or is patently without merit." 725 ILCS 5/122-1(a-5) (West 2022); *Hodges*, 234 Ill. 2d at 10, 16-17. If the court finds that the petition is "frivolous or patently without merit," it is summarily dismissed. *Id.* Defendant's burden at this stage is a "low" one and in order for a defendant's *pro se* petition to survive, it must merely present the "gist" of a constitutional claim. *Hodges*, 234 Ill. 2d at 9. A dismissal of a defendant's *pro se* postconviction petition is reviewed *de novo*. *Id.*

¶ 23    On appeal, defendant argues that his *pro se* postconviction petition presented constitutional claims that (1) trial counsel was ineffective or failing to raise the defense of dwelling, (2) trial counsel was ineffective for failing to present evidence that defendant had been previously shot thereby supporting his claim that the shooting of Riley was justified, and (3) appellate counsel was ineffective for failing to raise these two instances of ineffective assistance of counsel on direct appeal. We will address each contention in turn.

¶ 24                          A. Ineffective Assistance of Trial Counsel

¶ 25    Defendant asserts, on appeal, that the postconviction petition should not have been dismissed because of two distinct claims that trial counsel was ineffective. First, he alleges that trial counsel was ineffective for failing to assert defense of dwelling, and second, for not providing evidence that he had been shot nine months before the present incident. " 'At the first stage of postconviction proceedings under the Act, a petition alleging ineffective assistance may not be summarily dismissed if (i) it is *arguable* that counsel's performance fell below an objective standard of reasonableness and (ii) it is *arguable* that the defendant was prejudiced.' " (Emphases in original.) *People v. Tate*, 2012 IL 112214, ¶ 19 (quoting *Hodges*, 234 Ill. 2d at 17). "This 'arguable' *Strickland* test [(*Strickland v. Washington*, 466 U.S. 668 (1984))] demonstrates that first-stage postconviction petitions alleging ineffective assistance of counsel are judged by a lower pleading standard than are such petitions at the second stage of the proceeding." *Id.* ¶ 20. "During first-stage postconviction proceedings, 'a defendant need only show that he can arguably meet those two standards ***.' " *People v. Townsend*, 2020 IL App (1st) 171024, ¶ 22 (quoting *People v. Wilson*, 2013 IL App (1st) 112303, ¶ 20). "A defendant must satisfy both prongs of the *Strickland* test or the claim must fail." *People v. Houston*, 2024 IL App (5th) 230190-U, ¶ 12.

¶ 26                                    1. *Defense of Dwelling*

¶ 27     Defendant asserts that trial counsel rendered ineffective assistance by not raising defense of dwelling and failing to request that the jury be instructed accordingly. He contends that an occupant need not await unlawful entry before employing justifiable force against an intruder. Defendant argues that the facts of this case substantiate that his dwelling was under attack from an intruder and that he employed force to defend the dwelling. Furthermore, he maintains that the evidence presented at trial supported his reasonable belief that the force used was necessary to prevent the commission of a felony within the dwelling, such as a home invasion or an aggravated battery. Defendant asserts that trial counsel did not mention defense of dwelling during the proceedings nor request the pertinent jury instruction, and that such omission was objectively unreasonable. Additionally, defendant claims that trial counsel's "failure to assert, litigate, and utilize defense of dwelling was arguably highly prejudicial" to defendant, and argues that had the jury been instructed on this defense, there exists a reasonable probability that the trial's outcome would have differed.

¶ 28     In response, the State contends that while Riley was yelling at the gate, defendant was the one who voluntarily pushed past the gate and exited the building to confront Riley. The State asserts that Riley was not attempting to unlawfully enter the building but was instead trying to lure defendant outside to engage in a fight. It argues that, since there was no evidence indicating Riley's attempt to unlawfully enter the apartment, defendant's belief that the use of deadly force was necessary to prevent violence to an occupant of the dwelling was rebutted. The State further maintains that, as the evidence does not support a defense of dwelling, defendant cannot establish that trial counsel's performance was deficient nor demonstrate prejudice.

¶ 29     In his reply, defendant reiterates that a home dweller is not required to wait for unlawful entry to be accomplished prior to using justifiable force, citing *People v. Stombaugh*, 52 Ill. 2d 130, 136-38 (1972). Defendant further asserts that the State's claim that there was no evidence that Riley was attempting to unlawfully enter was incorrect, as Riley had already made entry on the property in a "violent, riotous, tumultuous manner."

¶ 30     Section 7-2 of the Criminal Code "states that the use of force which is likely to cause death or great bodily harm is justified only if the [unlawful] 'entry is made or attempted' in a violent, riotous or tumultuous manner and if the person reasonably believes that such force is necessary to prevent an assault on or violence to him or another person in the dwelling." *Id.* at 136; 720 ILCS 5/7-2(a)(1), (a)(2) (West 2016). Prior to assessing whether defendant reasonably believed that the use of force was necessary, it is necessary to establish whether Riley made or attempted to make an unlawful entry. Defendant contends that the State's assertion of the absence of evidence indicating Riley's attempt to unlawfully enter the property is incorrect, as he claims that Riley had already entered the property in a "violent, riotous, and tumultuous manner." We do not agree.

¶ 31     The entirety of the evidence demonstrates that Riley never entered the apartment or the apartment building, let alone the property, as supported by the testimony of witnesses, including defendant himself. Defendant testified that he heard Riley shouting for him to come outside. Instead of waiting, defendant went downstairs to confront Riley. Defendant further stated that he then decided to go outside the gate when Riley said, "I'm gonna catch your bitch ass on the street." Riley did not even have the opportunity to breach the gate and attempt to ingress, as defendant exited first. This was corroborated by Morales, West, Denika, and Demeisha, who all testified that defendant went outside of the gate to confront Riley.

11

¶ 32    More importantly, defendant is unable to demonstrate that permitting Riley to pass through the gate would have constituted an unlawful entry, an element required by section 7-2. An essential element for the use of defense of dwelling is that the entry be unlawful; this condition is not satisfied in the present case. First, Denika, one of the apartment's occupants, invited Riley to the apartment, as she testified that after her argument with defendant, she called Riley to come and pick her up. Further, later, Denika was holding the gate closed to prevent the altercation. Had Denika chosen to admit Riley through the gate at that time, again, such an invitation would not have been unlawful. Simply put, defendant cannot satisfy the "unlawful entry" requirement for defense of dwelling.

¶ 33    Defendant further contends that section 7-2(a)(2) applies, asserting that the use of force employed was essential to prevent Riley from entering the apartment and committing an aggravated battery or home invasion. However, as previously indicated, there is no evidence demonstrating that Riley attempted to unlawfully cross the gate to access the apartment. Instead, he remained outside the gate, awaiting defendant's emergence to engage in a confrontation.

¶ 34    Defendant relies on *People v. Smallwood*, 2023 IL App (5th) 220124-U, to support the proposition that defense of dwelling was applicable in this case. In *Smallwood*, a group of individuals was shouting for the defendant to come outside. *Id.* ¶ 4. This group was exerting efforts by knocking on doors, jiggling door handles, and attempting to open the garage. *Id.* After approximately 30 minutes, when it appeared that the garage was about to be opened by the group, the defendant discharged a firearm through the garage, inflicting injuries on two individuals. *Id.* On appeal, it was determined that counsel for the defendant was ineffective for failing to assert defense of dwelling. *Id.* ¶ 49. However, *Smallwood* is factually distinguishable from the present case, rendering it inapplicable. In this matter, defendant did not remain inside but instead exited

the residence and confronted Riley outside and beyond the gate. In *Smallwood*, the attacking party was a group of 8 to 10 individuals, whereas in this case, only Riley was involved. In *Smallwood*, the group tried to open the garage and nearly succeeded; in contrast, Riley remained outside the gate, initially banging on it, but did not attempt to open, climb over, or otherwise access defendant's apartment. Finally, the group in *Smallwood* attempted to unlawfully enter the defendant's residence. Here, had Riley passed through the gate (and even up to the apartment), such entry would have been lawful.

¶ 35 No witness testified that Riley ever crossed the gate. There was no evidence indicating that Riley stated he would enter if defendant did not exit. No witness testified that Riley attempted to climb over or breach the gate. All testimonies from witnesses are consistent in asserting that Riley was outside the gate, not attempting to enter, and that it was defendant who went through the gate towards Riley. "[O]ne may use force to *[p]revent* an entry into a dwelling \*\*\*." (Emphasis added.) *Stombaugh*, 52 Ill. 2d at 136. Although Riley may have been angry, shouting, and taunting defendant, he did not attempt to enter the dwelling, and there was nothing defendant needed to prevent. Furthermore, had he been admitted through the gate by Denika, such entrance would have been lawful. Since Riley did not make unlawful entry into the property, let alone try to do so, it is unnecessary to address whether defendant was justified in his use of force to prevent it.

¶ 36 " '[D]ecisions such as what evidence to present, whether to call a certain witness and what theory of defense to pursue are matters of trial strategy.' " *People v. Wiggen*, 2021 IL App (3d) 180486, ¶ 27 (quoting *People v. Morris*, 2013 IL App (1st) 110413, ¶ 74). " 'Matters of trial strategy are generally immune from claims of ineffective assistance of counsel.' " *Id.* (quoting *People v. Smith*, 195 Ill. 2d 179, 188 (2000)). The witness testimony, including that of defendant, at trial discredited any theories founded on defense of dwelling, thereby indicating that it was trial

13

strategy not to pursue that argument. Consequently, we determine that defendant is unable to establish that trial counsel's performance was arguably deficient due to the failure to assert defense of dwelling.

¶ 37                                    2. *Previous Shooting*

¶ 38    Defendant further contends that trial counsel was arguably ineffective in neglecting to introduce evidence indicating that he had been shot in the back nine months prior to the incident in question. He argues that presenting medical records of the shooting to demonstrate its impact on his perception of danger would have bolstered his self-defense argument. Additionally, defendant asserts that the prior shooting "support[s] [defendant's] version of events that he feared Riley gaining control of the firearm after Riley struck [defendant] in the face and caused [defendant] to fall to the ground."

¶ 39    In response, the State asserts that for acquittal on self-defense grounds, defendant's belief that deadly force was necessary must have been objectively reasonable. It further argues that knowledge of a victim's tendencies affects the assailant's perceptions, but that here, defendant was not relying on any prior interaction with Riley. The State asserts that "[e]vidence that he was shot in a prior unrelated incident does not bear on whether his belief regarding the necessity of using deadly force against Riley was objectively unreasonable."

¶ 40    Defendant replies that the perception of danger is consistently material and relevant to defendant's belief that the use of deadly force was justified. Defendant further asserts that the State's position, claiming that the previous shooting would not be relevant to defendant's defense regarding the use of force, is incorrect because of the "procedural posture of this case being at the first stage of post-conviction proceedings."

14

¶ 41    The fact that defendant was shot nine months prior by someone other than Riley is neither material nor relevant to defendant's contention that he believed the use of deadly force was justified in this case. "The elements of self-defense are that (1) unlawful force is threatened against a person; (2) the person threatened is not the aggressor; (3) the danger of harm is imminent; and (4) the use of force was necessary." *People v. Grayson*, 321 Ill. App. 3d 397, 402 (2001). "Self-defense has both a subjective aspect and an objective one: the defendant must believe that a danger exists that requires the use of the force applied, the belief must be objectively reasonable, and the use of force must actually be necessary." (Emphasis omitted.) *People v. Robinson*, 375 Ill. App. 3d 320, 335 (2007).

¶ 42    Whether defendant was on heightened alert for the necessity of self-defense (*i.e.*, subjective belief) does not exempt him from the obligation to demonstrate imminence or that the force employed was indeed necessary. Defendant himself testified that he forcefully exited the gate after hearing Riley state that he would catch defendant on the streets. Riley's statement alone threatened a potential future confrontation and did not establish imminent danger. In other words, Riley referred to potential harm at some unspecified future time, and the use of defendant's perception of harm caused by the previous shooting has no bearing on the absence of imminent danger to defendant. Since defendant is unable to demonstrate imminent danger, the contention that trial counsel should have inquired about the previous shooting does not affect his likelihood of a successful self-defense claim and therefore remains frivolous and patently without merit.

¶ 43    Defendant relies upon *People v. Miller*, 2024 IL App (1st) 230461-U, to support his position. In that case, defense counsel questioned the defendant about a prior shooting; however, the evidence was objected to by the State. Because trial counsel had not provided prior notice to the State that the defendant was to be questioned regarding the previous shooting, the trial court

15

did not admit such evidence. *Id.* ¶ 8. On direct appeal, the appellate court determined that trial counsel had not demonstrated a relevance between the prior shooting and the incident charged. *Id.* ¶ 11. The defendant subsequently filed a *pro se* postconviction petition, alleging, *inter alia*, that trial counsel was ineffective for failing to make an adequate offer of proof. *Id.* ¶ 12. This petition was dismissed at the first stage. *Id.* ¶¶ 12-13, 19. Upon appeal of the dismissal, the State did not contest the substantive merits of the postconviction petition but argued solely that the appeal was barred by *res judicata*. *Id.* ¶ 18

¶ 44    *Miller* is factually distinguishable and inapplicable to the present matter. In this case, the State contends that the previous shooting of defendant is irrelevant and challenges the merits of defendant's claims on appeal. Conversely, the appellate court in *Miller* did not examine the substantive issue of ineffective assistance of counsel because the State did not argue it.

¶ 45    Decisions on what evidence to present are considered trial strategy. *People v. Carini*, 357 Ill. App. 3d 103, 120 (2005). "Reviewing courts make 'every effort to evaluate counsel's performance from his perspective at the time, rather than through the lens of hindsight.' " *People v. Gilker*, 2023 IL App (4th) 220914, ¶ 93 (quoting *People v. Perry*, 224 Ill. 2d 312, 344 (2007)). "Ineffective assistance will be found only if counsel's strategy is so unsound that it results in a complete failure to conduct meaningful adversarial testing of the State's case." *Id.* There was no evidence that would sustain a defense of dwelling contention and defendant's own admission that Riley would get to him at a later time defeats his self-defense claim, thereby negating the need for the use of his claimed perception of fear from a previous shooting. As such, trial counsel's performance did not arguably fall below an objective standard of reasonableness. First-stage postconviction petitions "may be summarily dismissed only if they have 'no arguable basis either in law or in fact.' " *Tate*, 2012 IL 112214, ¶ 20 (quoting *Hodges*, 234 Ill. 2d at 11-12). Such is the

situation here. Accordingly, the trial court did not err in summarily dismissing defendant's postconviction petition as frivolous and patently without merit.

¶ 46                    B. Ineffective Assistance of Appellate Counsel

¶ 47    Defendant's final argument is that appellate counsel in the direct appeal was ineffective for neglecting to raise the aforementioned claims of ineffective assistance of counsel. "Claims of ineffective assistance of appellate counsel are measured against the same standard as those dealing with ineffective assistance of trial counsel." *People v. Childress*, 191 Ill. 2d 168, 175 (2000). "A petitioner who contends that appellate counsel rendered ineffective assistance of counsel must show that the failure to raise an issue on direct appeal was objectively unreasonable and that the decision prejudiced petitioner." *Id.* "Ultimately, a 'gist' of a constitutional claim of ineffective assistance of appellate counsel turns on 'whether petitioner's underlying ineffective assistance of trial counsel claim would have been successful if raised on direct appeal.' " *People v. Cole*, 2012 IL App (1st) 102499, ¶ 18 (quoting *Childress*, 191 Ill. 2d at 174-75).

¶ 48    "[W]hether a claim of ineffective assistance of appellate counsel would have merit, we must consider whether there would have been arguable merit to the underlying issue that appellate counsel failed to raise ***." *People v. Delgado*, 2022 IL App (2d) 210008, ¶ 27. As previously explained, trial counsel was not arguably ineffective for not arguing defense of dwelling nor questioning defendant regarding a previous shooting. As a result, there was no arguable merit for appellate counsel to advance those claims of trial counsel's ineffectiveness in the direct appeal. Since we find that trial counsel was not ineffective, appellate counsel, too, was not ineffective for not arguing as such on direct appeal. "Where the underlying issue is nonmeritorious, a defendant suffers no prejudice." *People v. Carroll*, 2024 IL App (4th) 231207, ¶ 88.

17

¶ 49                         III. CONCLUSION

¶ 50    For the foregoing reasons, we affirm the Champaign County circuit court's dismissal of defendant's postconviction petition.

¶ 51    Affirmed.